In the
United States Court of Appeals
For the Seventh Circuit

No. 98-1386

BOUTROS MALEK,

Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.


Petition for Review of an Order
of the Board of Immigration Appeals
A72-651-490


Submitted June 8, 1999--Decided January 6, 2000


   Before COFFEY, EASTERBROOK and ROVNER, Circuit Judges.

   COFFEY, Circuit Judge.  Boutros Malek is a native
and citizen of Lebanon who last entered the
United States in 1991./1 On May 24, 1994, an
Order to Show Cause (OSC) was issued after Malek
pled guilty to two counts of wire fraud and one
count of misuse of a social security number. The
OSC alleged that Malek entered the United States
without inspection/2 and was convicted of a
crime involving moral turpitude within five years
of entry, in violation of sections 241(a)(1)(B)
and 241(a)(2)(A)(i) of the Immigration and
Nationality Act of 1952. See 8 U.S.C. sec.
1251(a)(1) (B), (a)(2)(A)(i) (1994). At the
deportation hearing, Malek admitted the
allegations in the OSC, conceded deportability,
and applied for asylum and withholding of
deportation. The Immigration Judge (IJ) denied
Malek's application for asylum, and the Board of
Immigration Appeals (BIA) dismissed the appeal.
We deny the petition for review.

I.  BACKGROUND

   Shortly after Malek entered the country in
1991, he embarked on a life of crime. According
to the indictment to which he pled guilty, Malek
rented a room and contracted for telephone
service using another person's name and social
security number. Malek and others proceeded to
make hundreds of international telephone calls,

incurring more than $70,000 worth of charges during a period of a little more than two weeks. After Malek pled guilty to two counts of wire fraud and one count of misuse of a social security number, he was sentenced to concurrent terms of 12 months' imprisonment and was ordered to pay more than $80,000 restitution. After being convicted, deportation proceedings were initiated against Malek and he made application for asylum and withholding of deportation.

### Country Conditions in Lebanon

The Department of State's 1995 Country Report for Lebanon states that representation in the Lebanese parliament is   Christian and  Muslim, and that the president is by tradition a Christian. The report states that non-Lebanese military forces, including Syrian troops, a contingent of Israeli army regulars, an Israeli-supported militia in southern Lebanon, and several armed Palestinian factions, control much of Lebanon and undermine the authority of the central government. Additionally, Israeli forces, the South Lebanon Army, Hezbollah (the Iranian-backed Muslim militia), and allied Palestinian guerrillas, continue to engage in armed conflict in southern Lebanon. The report goes on to state that the Lebanese economy was recovering from the massive damage it suffered because of war-like conditions between 1975 and 1990.

The Country Report states that the government has not made substantial efforts to improve human rights since the end of the hostilities in Lebanon, but that the constitutional provision for freedom of religion is respected in practice. The report goes on to state, however, that life and property in southern Lebanon are still threatened by attacks. Furthermore, the Lebanese army arrests and detains former members of the Lebanese Forces (the dissolved Christian militia). But, the report notes that the government pardoned former army commander General Aoun and two of his aides in 1991 on the condition that they leave Lebanon and remain in exile for five years.

### Malek's Asylum Application

In his asylum application, Malek claimed that he was affiliated with General Michael Aoun and his army during the civil war in Lebanon; that his home and business were destroyed in the civil war; that Hezbollah Muslims sought him because he was an active political dissident and a Christian, and because he was a political opponent of terrorist groups sponsored by Iran and Syria. He also stated that he would be at

risk in Lebanon because Syrian forces controlling portions of Lebanon consider General Aoun to be a political enemy. Additionally, Malek alleged in his asylum application that he and his wife were kidnaped in 1980 by the Syrians, that he and his wife were beaten and subjected to electric shocks while detained, and that his wife was raped repeatedly in front of him. Finally, he claimed in his application that he would be persecuted on account of religion, nationality, political opinion, and membership in a particular social group if he returned to Lebanon.

## Malek's Testimony

Petitioner Malek, a Syriac Catholic, testified at his April 1996 deportation hearing that civil strife began in Lebanon in April 1975. Malek stated that he was a supporter of the Christian Phalangist militia from 1969, when he was 11-years old, and that he was a commander with the Christian militia in 1976. Malek further testified that he was captured by the Syrian army and Hezbollah, but was released in a prisoner exchange. He testified that friends of his who were captured at the same time have subsequently informed the Syrian, Hezbollah, and Jihad Islamic forces who he is, and that these forces now seek him because of his active resistance to foreign forces in Lebanon.

He testified that he was kidnaped and detained six or seven times in Lebanon between 1977 and 1988 for periods of two to five days, and that he was beaten and tortured on those occasions. He testified that his wife was detained with him for two or three days in 1980,/3 and that, while detained, they were tortured and that she was raped repeatedly in front of him. Finally, Malek stated that he would be killed if he returned to Lebanon.

## Mrs. Malek's Testimony

Madeline Malek, petitioner's wife and a Maronite Christian, testified that the Malek family left Lebanon permanently in 1991 because: 1) two of her children were American citizens; 2) she was raped in Lebanon; and 3) the Syrian army had threatened to kill her husband. Mrs. Malek explained that she was raped on the street by two unidentified men when going from a store to her house, but was unable to remember what year the raped occurred. Contrary to Malek's testimony that she was raped repeatedly in front of him, Mrs. Malek testified that she was not raped at any other time. She went on to testify that the whole family was jailed in about 1988 by the Syrian army, but the captors released them within

two or three days after some money and a watch was stolen from the Malek family.

With regard to Malek's military service, Mrs. Malek testified that her husband was in the army in the early 1970's but left the army in 1976. She also stated that Malek provided fiscal support to the army between 1979 and 1991.

The Immigration Judge's Decision

When determining that Malek failed to establish eligibility for asylum and withholding of deportation, the IJ properly considered Malek's credibility to be of significant importance. The IJ determined that there were "significant discrepancies, inconsistencies and evidentiary gaps" in Malek's application and testimony, and concluded that Malek's claim was not "sufficiently credible, consistent or plausible" to warrant the granting of asylum.

In concluding that Malek was not credible, the IJ noted that Malek testified that he was kidnaped, beaten and tortured by Syrian forces between 1977 and 1988, but failed to mention any of these events in his asylum application. The IJ went on to note that during the times that Malek was allegedly being subjected to beatings and torture, he visited the United States on six occasions, yet never sought asylum. As for Malek's fear of persecution based on his support of General Aoun, the IJ stated that Malek admitted that he was not an actual member of the militia forces, but merely a financial supporter. The IJ found it implausible that Syrian forces would persecute Malek on the basis of his alleged financial support to Aoun from 1979 to 1991 given the fact that he traveled to Damascus, Syria in 1991 without incident.

The IJ recognized that Malek may have sustained losses to his business and property holdings in the course of the Lebanese civil war that began in 1975, but stated that Malek failed to establish that the losses were the result of an act of persecution directed against him, as opposed to the result of general civil strife. Relying on the underlying facts of Malek's criminal conduct and a finding that Malek's testimony "was at times vague, lacking in internal consistency and plausibility[,] and [that Malek's] whole overall claim was highly lacking in persuasiveness[,]" the IJ denied Malek's application for asylum and withholding of deportation.

The Board of Immigration Appeals

The BIA agreed with the IJ's decision that Malek did not present credible evidence demonstrating that he was the victim of past persecution or that he had a well-founded fear of persecution should he return to Lebanon. In agreeing with the IJ, the BIA addressed numerous material inconsistencies between the testimony of Malek and his wife, and Malek's application. The BIA noted that Mrs. Malek testified that two unidentified men raped her on the street, that she did not know who the assailants were, and that this was the only time she was raped. The BIA also noted that Mrs. Malek testified that the Syrian army had arrested her and her family, and that they were held for 2-3 days in an underground room./4

As the BIA observed, Malek offered a vastly different version of events. Malek's application stated that the Syrian army had kidnaped him and his wife and that they were detained for over two months. Although Mrs. Malek testified to nothing even resembling this, Malek stated that they were beaten, given electric shocks, given little food or water, and that his wife was raped repeatedly in front of him. Finally, the BIA noted that although Malek testified that the Syrian army mistreated him and his wife, his application stated that it was Hezbollah who did so.

The BIA also concluded that,

[b]esides the credibility problems with the respondent's testimony, we find that the other witnesses' testimony was not sufficient to corroborate the respondent's written and oral statements as their knowledge of the respondent's experiences in Lebanon appears to be limited. For example, [Malek's] pastor testified that he did not personally know the respondent in Lebanon . . . . Also, he stated that the respondent and his wife did not discuss their experiences in Lebanon with him . . . . Also, [Malek's] daughter was unable to corroborate much of [his] testimony because she was young when many of the events to which [Malek] testified occurred. For example, she did not find out until recently that her mother had been raped and her father detained . . . . Therefore, we conclude that the respondent's application for asylum and withholding of deportation has not been presented in a sufficiently detailed and consistent manner to provide a plausible and coherent account of the basis for his fear.

Finally, the BIA stated that it did not believe Malek had a well-founded fear of future persecution given the fact that Malek made "numerous visits to the United States between 1978 and 1991" and had always returned to

Lebanon. The BIA noted that if the conditions in Lebanon were truly as Malek described them, then he would have had numerous opportunities to seek asylum during his visits to the United States but never saw fit to do so, and the BIA could see "no difference in the respondent's [current] situation."

On appeal, Malek argues: 1) that the IJ and BIA applied "too difficult a standard for [him] to meet in establishing his claim for asylum[;]" and 2) that, despite his failure to request an interpreter, the IJ should have sua sponte provided an interpreter for Mrs. Malek.

## II. ANALYSIS

### A. Malek's Asylum Claim

Malek's main argument on appeal is that the BIA wrongly determined that he did not qualify as a refugee for asylum purposes. In reviewing Malek's claim for asylum and withholding of deportation, we defer to the BIA's factual findings, reversing the BIA only if the record lacks substantial evidence to support its factual conclusions. See Angoucheva v. INS, 106 F.3d 781, 788 (7th Cir. 1997). Therefore, the BIA's conclusion that Malek failed to present specific facts that he had been persecuted or had good reason to fear that he will be singled out for persecution in the future will only be disturbed if the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Angoucheva, 106 F.3d at 788 (quoting INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992)). This standard is "highly deferential" to the BIA because of the "fact-intensive nature of [deportation] inquiries and the superior expertise of the agencies that administer our immigration law." Bhatt v. Reno, 172 F.3d 978, 981 (7th Cir. 1999) (citation omitted).

As we stated in Ahmad v. INS, 163 F.3d 457, 461 (7th Cir. 1999),

Credibility determinations are accorded substantial deference, but they must be supported by "specific, cogent reasons." Nasseri v. Moschorak, 34 F.3d 723, 726 (9th Cir. 1994), overruled on other grounds by Fisher v. I.N.S., 79 F.3d 955 (9th Cir. 1996). In addition, these reasons must "bear a legitimate nexus to the finding." Id. Credibility determinations in these sorts of proceedings should only be overturned under extraordinary circumstances, Nasir v. INS, 122 F.3d 484, 486 (7th Cir. 1997), and a reviewing court should not supersede an administrative agency's findings simply because an alternative finding could also be supported by

substantial evidence, Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S. Ct. 1046, 117 L. Ed.2d 239 (1992).

In the present case, the BIA offered cogent reasons for its adverse credibility determination that had the requisite nexus to Malek's claim. The BIA, after reviewing all the testimony, simply did not believe Malek's version of events and offered logical reasons for its credibility determination. Malek is correct that there are instances where courts have ruled that a credibility determination was not supported by substantial evidence. See e.g., Cordero-Trejo v. INS, 40 F.3d 482 (1st Cir. 1994); Argueta v. INS, 759 F.2d 1395 (9th Cir. 1985). Unlike those situations, however, this is not a case where the BIA's adverse credibility determination was not based on substantial evidence. For example, Malek's application stated that he and his wife were detained for two months, tortured, given little food or water, and that his wife was raped repeatedly in front of him. On the other hand, Mrs. Malek: 1) never claimed to have been raped while in captivity; 2) claimed to have been held for only 2-3 days (not 2 months); and 3) never mentioned being tortured.

Here, there were a number of clear inconsistencies between Malek's and his wife's testimony, as well as with Malek's testimony and his written application, and the BIA did not make unsupported, blanket statements that it simply did not believe Malek. On the contrary, the BIA provided ample reasons for its disbelief. We are convinced that substantial evidence supports the BIA's decision to deny Malek's claim for asylum./5

B.  The Decision to Proceed Without an Interpreter

In addition, Malek raises, for the first time in his appellate brief before this court, the argument that his wife should have been provided an interpreter. However, Malek did not raise this claim or any support for it before the IJ (in fact, Malek's counsel declined the IJ's offer for an interpreter) or the BIA, and this court has made clear that it "will not weigh evidence that the Board has not previously considered; an appellate court is not the appropriate forum to engage in fact-finding in the first instance." Rhoa-Zamora v. INS, 971 F.2d 26, 34 (7th Cir. 1992).

We deny the Petition for Review.

/1 It is unclear from the record whether Malek was last admitted to the United States at Chicago, Illinois or New York, New York.

/2 Malek was admitted to the United States as a non-immigrant visitor for pleasure and authorized to remain in the U.S. for a period of six months. Malek, however, remained in the U.S. without authority from the INS.

/3 Malek's application for asylum and withholding of deportation stated that they were detained for two months.

/4 The BIA noted that the record reflected that Mrs. Malek may have had difficulty understanding and speaking English, but neither she nor Malek ever requested an interpreter. Malek did not raise the issue on his appeal to the BIA.

/5 Because Malek fails to demonstrate that he should have been granted asylum, he necessarily fails to satisfy the more stringent requirements for withholding of deportation. See Boykov v. INS, 109 F.3d 413, 418 (7th Cir. 1997).