# United States Court of Appeals
## For the First Circuit

---

No. 02-1541

MARWAN YOUSSEF ALBATHANI,
Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,
Respondent.

---

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

---

Before

Lynch, <u>Circuit Judge</u>,
Farris,[*] <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

---

<u>Ronald L. Abramson</u>, with whom <u>Abramson, Bailinson & O'Leary, P.C.</u>, was on the brief for petitioner.
<u>Beth Werlin</u>, with whom <u>Mary A. Kenney</u>, <u>Nadine K. Wettstein</u>, <u>Iris Gomez</u>, <u>Harvey Kaplan</u>, and <u>Kaplan, Sullivan & Friedman</u> were on the brief for American Immigration Law Foundation, amicus curiae.
<u>John C. Cunningham</u>, Senior Litigation Counsel, Office of Immigration Litigation, with whom <u>Robert D. McCallum, Jr.</u>, Assistant Attorney General, <u>Linda S. Wendtland</u>, Assistant Director, and <u>Terri J. Scadron</u>, Senior Litigation Counsel, were on the brief for respondent.

---

February 6, 2003

---

[*]Of the Ninth Circuit, sitting by designation.

**LYNCH**, <u>Circuit Judge</u>. Marwan Youssef Albathani, a native and citizen of Lebanon, petitions for review of the Board of Immigration Appeal's (BIA's) summary affirmance of an Immigration Judge's denial of his application for asylum, withholding of deportation, and relief under the United Nations Convention Against Torture. His case raises a challenge, new for this court, to the validity of the BIA's streamlining procedures adopted in 1999. 8 C.F.R. § 3.1(a)(7)(2002)(<u>amended by</u> 67 Fed. Reg. 54,878 (Aug. 26, 2002)).

Albathani, a Maronite Christian, sought asylum on the basis that he feared persecution by members of Hezbollah active in Lebanon. He arrived in the United States in January 1999 without any valid documents permitting entry. He was taken into custody by the INS and had an initial interview and a subsequent credible fear interview; he was found to have a credible fear of persecution. He was allowed to remain in the United States pending a hearing on his asylum and other claims. At the hearing in September 2000, the Immigration Judge (IJ) found Albathani's story not credible and denied his application. Her finding was affirmed by the BIA in a summary affirmance under 8 C.F.R. § 3.1(a)(7).

Albathani challenges this ruling on several grounds: both that his hearing before the IJ denied him due process of law, for several reasons, and that the summary affirmance procedure itself violates due process. Additionally, an amici curiae brief filed by

-2-

the American Immigration Law Foundation, the New England Chapter of the American Immigration Lawyers Association, and the Massachusetts Law Reform Institute argues that the summary affirmance procedure also violates rules of administrative law.[1]  We affirm.

I.

From the 1940s to the 1970s, political power has been shared in Lebanon between members of different religious communities.  The president is traditionally a Maronite Christian, while the prime minister is traditionally a Sunni Muslim.  Lebanon's Parliament is also divided on a system of proportional representation based on religion.  This compromise broke down in the 1970s, however.  Between 1975 and 1990, Lebanon was wracked by conflict, both between Lebanese Christians and Muslims, and among foreign forces.  According to the State Department, non-Lebanese military forces control much of the country.  See Malek v. INS, 198 F.3d 1016, 1018 (7th Cir. 2000).  A variety of militias are associated with different groups in Lebanon, both foreign and domestic.  The conflict between two of those militias is pertinent here: the Lebanese Forces, a rightist, Christian militia, and Hezbollah, an Islamicist militia with foreign support.

The  Lebanese Forces was affiliated with the Christian Phalangist militia, a Maronite group which had fought against

---

[1]  We express our appreciation to amici for their valuable assistance.

-3-

Muslim nationalists in 1975, touching off Lebanon's civil war. The Lebanese Forces was founded in 1976. In 1991, it was licensed as a political party, but in 1994 it was banned and a number of members were arrested because of alleged involvement in the bombing of a church. The leader of the Lebanese Forces, Samir Geagea, was also arrested and charged with the murder of a political rival. In 1995, Geagea was found guilty and sentenced to death, although the sentence was commuted to life imprisonment. Subsequently, Geagea was charged with the 1987 assassination of Muslim Prime Minister Rashid Karami. Other members of the Lebanese Forces were convicted of a 1996 bus bombing in Syria which killed eleven people.

Hezbollah, meanwhile, is a Shia Muslim political group backed by Iran. It became prominent in the mid-1980s in battles against Israeli forces in southern Lebanon. In Lebanon, Hezbollah operates in the Bekaa Valley, the southern suburbs of Beirut, and southern Lebanon. It is known or suspected to have been involved in terrorist attacks including the truck bombings of the U.S. Embassy and marine barracks in Beirut in October 1983. <u>See</u> U.S. Dep't of State, <u>Background Information on Foreign Terrorist Organizations</u> (Oct. 8, 1999), <u>available at</u> http:/www.state.gov/ www/global/terrorism/fto_info_1999.html. On November 2, 2001, Hezbollah was added to the list of terrorists and groups linked to terrorism covered by Executive Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001), which blocked access to their assets. <u>See</u>

U.S. Dep't of State, <u>Comprehensive List of Terrorists and Groups Identified Under Executive Order 13224</u>, <u>available at</u> http: www.state.gov/s/ct/rls/fs/2001/6531.htm.

Marwan Albathani, a Maronite Christian, was born in Lebanon on November 15, 1973, and grew up in the midst of this conflict. Members of his family were involved in the Lebanese Forces, including an older brother, who was a captain of the Lebanese Forces in the Dikwane district of Beirut. Albathani lived in Beirut, as did some of his sisters and brothers. His father and other sisters lived in Deir El-Ahmar, approximately two hours to the east of Beirut. Other of his relatives lived in the United States. Albathani sometimes worked in Beirut, sometimes not; when he worked it was as either a car mechanic or a car dealer. Albathani asserted that after persecution by members of Hezbollah he decided to flee Lebanon.

Albathani traveled to Cyprus in November 1998, where he applied for a tourist visa to the United States but did not seek refugee status. On his application, Albathani claimed that he was married, that he worked as an electrician, that he had no relatives in the United States, and that he had no intention of working or studying in the United States (all untrue). Albathani's visa application was denied. Albathani then returned to Cyprus in January 1999, with a visa to Panama, purchased a plane ticket to

Panama by way of London and Miami, and got off in Miami on January 14. He was immediately taken into custody by INS officers.

A. Initial INS Interview

That day an INS officer with a translator interviewed Albathani. Albathani said he was "escaping from Lebanon because of the Hezbollah," which was harassing him because he was not Muslim. He said that he was a car salesman, and that both his mother and brother resided legally in the United States. Albathani admitted that he had no intention of going to Panama and wanted to stay in the United States. Based on this initial interview, the INS officer scheduled a further credible fear interview.

B. Credible Fear Interview

During his credible fear interview on January 27, 1999, three different interpreters were required before one was found who could understand Albathani's difficult accent. Albathani told the interviewing INS officer that he had served as a "regular soldier" in the Lebanese Forces for five years. His problems began in the mid-1990s; at that time whenever he visited his family in Deir El-Ahmar he was stopped and questioned by members of Hezbollah. On one occasion, three months before he left Lebanon, according to Albathani, he was stopped for four hours. He and his brother were tied up, Albathani was slapped in the face, they were placed in the trunk of a car, and robbed of $1,200 and some jewelry. Albathani attributed this to Hezbollah knowledge that he was a member of the

Lebanese Forces. He said that he was arrested "several times," but could not provide a specific number. He had to leave Lebanon because he feared being kidnapped by Hezbollah members.

Based on this interview, Albathani was found to have a credible fear of prosecution based on membership in a particular social group, namely the Lebanese Forces. The officer found that he was credible, that his testimony was "detailed, internally consistent, consistent [with] country conditions and any other extrinsic evidence," and that there was a "significant possibility that he ... could establish eligibility for asylum." Albathani was subsequently allowed to move from Miami to New Hampshire, where his family was located.[2]

C. Asylum Hearing

Albathani had submitted an application for asylum on October 14, 1999, in Miami. He admitted his illegal entry and conceded deportability. His application for asylum described two assaults by Hezbollah. In the first, in April 1996, he claimed he was stopped, interrogated, jailed in the town of Vaibalk, beaten and left by a roadside. He said he was then picked up and taken to a hospital, where he remained in a coma for over two weeks. In the second, more than two years later, he asserted he was again stopped

_____

[2] Once in the United States, Albathani was arrested twice, once for using someone else's credit card (although he claimed to be merely trying to return it), and once for selling alcohol to a minor.

and beaten, robbed of his car and money, and his life was threatened. Albathani said that this assault took place in December 1998, although in both his credible fear interview and the subsequent hearing before the IJ he dated it earlier, in either September or October 1998. No mention is made of a later threat. Albathani also described his work in the Lebanese Forces in greater detail, alleging that he had been a member since 1989, that he worked as a secretary from 1989 to 1992, and that from 1992 to 1998 he served as bodyguard for the group's leader. Albathani sought asylum, withholding of removal, and relief under the United Nations Convention Against Torture.

Albathani's asylum hearing took place in Boston, after he was granted a change of venue from Miami. In the hearing before the IJ on September 28, 2000, Albathani had one interpreter; the IJ expressed concerns that the interpreter had not brought an Arabic dictionary and had engaged in numerous colloquies with Albathani. Albathani was the only witness.

Albathani testified about two beatings on the road to his parents' house which were sketched out in his asylum application. We summarize what he said. The Lebanese Forces had ceased to participate as a political party as of 1995, and "had fallen apart," prior to both incidents. The area around his parents' house was controlled by Hezbollah. Hezbollah had a list of names of those who had served in the Lebanese Forces. In 1996, when

driving alone, Albathani was stopped by individuals he recognized as Hezbollah because of distinctive flags on their cars. They asked for his ID, took all his belongings, blindfolded him and hit him. Albathani lost consciousness during the beating and woke up in a hospital. Albathani reported this to the police, who declined to get involved with Hezbollah-related incidents. When asked if he had a copy of the police report, the interpreter reported his reply as, "No, he wasn't worried about the problem, [w]hen they told me that they can't help me when it comes to Hezbollah."

In the next two years, there were no further incidents. That was because Albathani was so afraid he did not go out. When questioned on this point he replied he did not mean he was afraid to go out, or to leave the house in Beirut, but he did not dare drive to see his parents. He did, however, travel to Syria and return to Lebanon sometime in the fall of 1998, shortly before the second beating. As to the 1998 incident, Albathani testified to the following. In September or October 1998, Albathani was travelling with his younger brother and a friend to his parents' house when they were stopped at a Hezbollah roadblock. Albathani was again asked for his ID, his belongings were taken, and he was beaten on his head and hands. Hezbollah asked him how long he had been with the Lebanese Forces. Afraid, he denied he had ever been. As he was being beaten, his captors told him "say that you were in the Lebanese Forces, otherwise you die." Albathani was again left

unconscious, and woke up in a hospital. His younger brother was blindfolded, but not beaten or robbed.

On both occasions, Albathani's cars -- both Mercedes -- were stolen by Hezbollah. He had scars on his back, hands and head as a result of the two beatings. The IJ suggested that photographs of them should be submitted so it would be in the record, but declined to make a closer firsthand examination of the scars. The record shows the IJ had a clear view of petitioner during the hearing.

In December 1998, members of the Hezbollah went to Albathani's sister's house and told her "if he stays over here he should consider death for himself. The first time he was able to run away, but now it's going to be death for him." Shortly thereafter, he looked for help to leave Lebanon. The message triggered his flight to the United States in January 1999.

During the period of the incidents, Albathani left Lebanon twice: once to Syria for two days, and once to Cyprus for two days. He returned to Lebanon each time. While in Cyprus in November 1998, he filled out a visa application, which contained falsehoods. During the hearing before the IJ, he explained the falsehoods by saying that someone else, possibly his brother, filled out the application; he just signed it.

The IJ rendered an oral decision the same day as the hearing. She rejected Albathani's claim for relief under the

Convention Against Torture because he had not shown injury at the hands of the government. She also rejected Albathani's application for asylum and withholding of deportation. The IJ found Albathani's testimony not credible, noted that he ran into difficulty with Hezbollah only when he drove the road to his parents' house, credited that he had been robbed but observed that his brother (who was with him during the incident) was neither harmed nor robbed, and commented that Albathani had returned to Lebanon from Cyprus after the incidents.

The IJ found Albathani's testimony not credible for a number of reasons. The details of the incidents varied from telling to telling, and there were internal contradictions in his account. For example, he claimed at the asylum hearing to be unconscious after the 1998 beating, but said in the earlier interview that he and his brother had been slapped and their money taken, they were forced into the trunk of a car, and driven to a "dark place" and left. Not only did he not mention being unconscious, he even described the place he was confined. Moreover, in the later account, Albathani said that his brother was unharmed, not placed in the trunk of a car, and did not have anything stolen from him. The IJ concluded that this, and other inconsistencies, were material differences that made Albathani a "less than credible witness."

The IJ also noted that Albathani had not produced corroborative evidence in the form of testimony by relatives who were in the United States. His mother lived in Boston and recently had become an American citizen, but, for whatever reason, had left the country two weeks before the scheduled hearing before the IJ. She might have confirmed his testimony that she was at his hospital bedside after the 1998 incident. He also had an uncle in Boston and his brother and cousin lived in the United States, none of whom testified on his behalf.

The IJ cited Albathani's abuse of immigration procedures, both in filling out the application for a tourist visa fraudulently, and in not filing for admission to the United States as a refugee from persecution at the United States Embassy in Cyprus. See generally 8 U.S.C. § 1158 (2000)(describing normal asylum procedures).

The IJ also questioned whether the attacks were motivated by political reasons, noting that Albathani was robbed on both occasions, and deprived of not one but two Mercedes. He also lost a large amount of money -- $1,200 by his own account in one incident -- and gold jewelry. She concluded, "At least one of the motives of the person stopping the car clearly appears to be robbery."

Finally, the IJ surmised that Albathani could have avoided further incidents by relocation, either by leaving Lebanon,

-12-

or by changing his behavior.  She cited Albathani's visits to Syria and Cyprus as evidence of his ability to avoid persecution without seeking asylum in the United States.  She concluded that Albathani's "goal was to come to the United States," not to avoid persecution.  The IJ also focused on the fact that both incidents took place in a single location -- the road between Beirut and Deir El-Ahmar.  She suggested that Albathani could have avoided the problem in Lebanon by seeking alternative routes or means of transportation to his parents' home.

In sum, the IJ concluded that Albathani had not shown a credible fear of persecution on one of the statutory grounds for asylum.  Because he failed to meet the test for asylum, he could not meet the more stringent test for withholding of removal.  He also was not entitled to relief under Article 3 of the Convention Against Torture as he had not shown he had been tortured at the hands of the government.[3]  The IJ ordered him deported from the United States.  Albathani appealed the IJ's decision to the BIA on October 28, 2000.  On April 9, 2002, utilizing the summary

---

[3]  The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, was implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-761 (codified at 8 U.S.C. § 1231 (2000)).  Article 3 prohibits states from returning individuals to other states where there are substantial grounds for believing they would be subject to torture.

affirmance procedure, the BIA affirmed without opinion the results of the IJ's decision.

II.

Petitioner characterizes his challenge of the IJ/BIA decision as being on due process grounds. He does not directly raise a claim that the decision is not supported by substantial evidence, but asserts instead that the decision improperly overlooked evidence, that the judge improperly hurried the hearing along, and that she berated the interpreter. The first ground is, in our view, just a variation on a substantial evidence challenge, and so we apply the usual substantial evidence standard. See, e.g., Mediouni v. INS, 314 F.3d 24, 26 (1st Cir. 2002); Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994). Determinations of eligibility for asylum or withholding deportation are conclusive "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacharias, 502 U.S. 478, 481 (1992)(internal quotation omitted).

"To reverse the BIA finding we must find that the evidence not only supports that conclusion, but compels it." Id. at 481 n.1; see also 8 U.S.C. § 1252 (b)(4)(B)(2000)("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."); Aguilar-Solis v. INS, 168 F.3d 565, 569 (1st Cir. 1999) (no reversal unless "the record evidence would compel a

-14-

reasonable factfinder to make a contrary determination"). Merely identifying alternative findings that could be supported by substantial evidence is insufficient to supplant the BIA's findings. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).

The INS is not entitled to extreme deference, although our review is deferential. Gailius v. INS, 147 F.3d 34, 44 (1st Cir. 1998). Review of the BIA's decisions is conducted on the basis of the entire record, not merely the evidence that supports the BIA's conclusions. Id. Additionally, this "court reviews the BIA's legal conclusions de novo, although it gives deference, where appropriate, to the agency's interpretation of the underlying statute in accordance with administrative law principles." Debab v. INS, 163 F.3d 21, 24 (1st Cir. 1998) (internal quotation omitted).

Because the "more likely than not" standard for withholding deportation is more stringent than that for asylum, a petitioner unable to satisfy the asylum standard fails, a fortiori, to satisfy the former. Mediouni, 314 F.3d at 27. "[W]ithholding is mandatory if an alien 'establishes that it is more likely than not that he would be subject to persecution on one of the specified grounds.'" INS v. Aguirre-Aguirre, 526 U.S. 415, 419 (1999) (quoting INS v. Stevic, 467 U.S. 407, 429-30 (1984)). For that reason, we consider first the denial of Albathani's application for asylum.

-15-

III.

A.  Denial of the Application for Asylum

The burden of proof for establishing eligibility for asylum lies on the petitioner.  8 C.F.R. § 208.13(a).  Applicants must show either past persecution or well-founded fear of future persecution.  Id. § 208.13(b).  Such past or future persecution must be based on "race, religion, nationality, membership in a particular social group, or political opinion."  Id. § 208.13(b)(1).  The petitioner bears the burden of providing "conclusive evidence" that he was targeted on any of the five grounds.  Velásquez v. Ashcroft, No. 01-1741, 2002 WL 31904478, at *2 (1st Cir. Dec. 30, 2002); see, e.g., Aguilar-Solis, 168 F.3d at 571 (finding that petitioner failed to carry his burden in proving past persecution because his account lacked the requisite degree of specificity, and because "the vague evidence of alleged persecution that the petitioner adduced failed to establish a sufficient nexus between the events that he described and any ground enumerated").

Here, we conduct our substantial evidence review of the IJ's decision regarding asylum and withholding of deportation,[4] rather than the BIA's opinion.  "Ordinarily, Courts of Appeals review decisions of the [BIA], and not those of an IJ.  When the BIA does not render its own opinion, however, and either defers

---

[4]  Albathani does not appeal the IJ's decision regarding his claim under the Convention Against Torture.

-16-

[to] or adopts the opinion of the IJ, a Court of Appeals must then review the decision of the IJ." Gao v. Ashcroft, 299 F.3d 266, 271 (3d Cir. 2002).

The burden was on Albathani to show that he was persecuted based on his membership in a particular social group, or for his political opinions. See 8 C.F.R. § 208.13(b). We assume arguendo that membership in the Lebanese Forces satisfies the "particular social group or political opinion" categories. The difficulty for Albathani is that the IJ did not find him credible on these claims. Accepting that he had been robbed and beaten by Hezbollah, the IJ did not find this to be persecution based on one of the five categories. The record provides adequate reason for doubt. The two incidents on the road may well have been, as the IJ suggested, nothing more than the robbery of someone driving a Mercedes with cash in his pocket. The IJ thought Albathani's fear of persecution was undercut by his twice returning to Lebanon after trips abroad.

It is true that the IJ did not specifically comment on his evidence -- a significant omission -- that Hezbollah later visited his sister's house and threatened him, and that this visit led him to seek refuge in the United States. But there was reason to doubt the event occurred; only Albathani's word established it, and there was a conspicuous lack of corroborating evidence from his family members in America. This is not an instance of the INS

-17-

improperly insisting on evidence that was not likely to be available to a refugee. See, e.g., Gailius, 147 F.3d at 45-46. There is nothing in the record to establish that Albathani was denied communication with his family in America. He was represented by counsel, and his cousin was present at one hearing with him. Indeed, Albathani was living with his brother in New Hampshire at the time of the hearing, and his aunt was present at an earlier hearing. He was also in contact with his older brother, then in Brazil, who had been in the Lebanese Forces and could have corroborated much of his story.

Petitioner argues that the IJ ignored evidence of Albathani's limited capacities in making her decision. We do not find support for this. The IJ's decision acknowledges Albathani's limited education (he left school at 15) and claim that he had head "trouble" since his beatings in her decision. His inarticulateness at the hearing was recognized by both the IJ and his own counsel. The IJ also noted Albathani's tendency to "fluctuate" on dates during the hearing, but did not rely on such changes in her decision. For example, during the hearing Albathani initially testified that his travel to Syria took place in 1999, even though he had already left for the United States by that date. He also demonstrated a tendency to agree with whatever assertion was put to him. During cross-examination, Albathani said that during his trip to Syria, he had received passport stamps from both the Syrian and

Lebanese border guards, testimony which was belied by his passport. The IJ took these limitations into account, commenting during the hearing that she did not "hold [his inarticulateness] against him."

Albathani's inconsistency problems go well beyond mere fluctuations. He showed a pattern of embellishing his story. In each context, Albathani added a new incident. He originally described a single beating (the 1998 one) in his credible fear interview. He did not mention at that time that he was hospitalized as a result of this beating. Then, in his application, Albathani added a 1996 incident, complete with hospitalization and a coma, as well as expanding the later incident to include almost a week's hospitalization. At the hearing itself, Albathani mentioned for the first time a second incident in 1998, the December threat delivered to his sister. Given this pattern, we find adequate support for the IJ's reservations regarding Albathani's credibility.

As petitioner points out, some instances in the record support his credibility. One example is his correct identification of a Lebanese Forces commander. It is also true that the IJ did not explicitly discuss the Country Conditions Report for Lebanon, admitted into evidence, other than as useful background. These Reports provide some support for Albathani's claimed fear of kidnapping and murder. Hezbollah is reported to detain and mistreat prisoners from groups to which it is opposed. There is no

evidence, however, of a pattern of kidnappings by Hezbollah in the last decade, although kidnapping was widespread during the civil war. But these Reports would not have straightened out the inconsistencies in Albathani's own stories.

On our review of the entire record, we do not find evidence sufficient to compel reversal of the denial of Albathani's asylum claim.[5] He, a fortiori, fails to satisfy the standard for withholding of deportation. See Velásquez, 2002 WL 31904478, at *4 n.2.

B. Due Process

Albathani raises before us a challenge he did not raise in such terms before the BIA: a procedural due process challenge to the IJ's conduct of his hearing. He alleges that the IJ improperly berated the interpreter, rushed the hearing along, sharply cross-examined him, and refused to examine evidence of his beatings in the form of scars. Respondent says that any due process claim is waived. See Mendes v. INS, 197 F.3d 6, 12 (1st Cir. 1999)(holding that petitioner "waived his due process claim by failing to raise it at his deportation hearing, at his hearing for suspension of deportation, or before the BIA"). We bypass the waiver question

---

[5] Albathani, citing Matter of Pula, 19 I. & N. Dec. 467 (BIA 1987), says the INS gave too much weight to the circumvention of orderly refugee procedures. The criticism is misplaced -- this was not the sole or even primary focus of the IJ.

-20-

because the claim is easily determined to be meritless, and because he raised similar arguments, under a different label, to the BIA.

As an unadmitted alien present in the United States, Albathani's due process rights are limited. See Kaplan v. Tod, 267 U.S. 228, 230 (1925) (presence in the country immaterial because excluded alien "was still in theory of law at the boundary line and had gained no foothold in the United States"). As a result, many constitutional protections are unavailable to Albathani. See Zadvydas v. Davis, 533 U.S. 678, 693 (2001); see also Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.") (internal quotation omitted).

Moreover, even if Albathani were an admitted alien, the problems he describes still would not rise to the level of a due process violation. Albathani's real complaint is that he may have been misunderstood and that his lack of credibility was simply a function of bad interpreting. But there is nothing to suggest this is so. At the hearing, neither Albathani nor his counsel questioned the accuracy of the translation by the interpreter at the IJ hearing. Even now, Albathani does not identify points in the hearing where the translation was inaccurate or misleading.

The IJ was, at times, short in her treatment of the interpreter, but may have had cause. "[O]rdinary efforts at

-21-

courtroom administration" do not mean that the hearing was unfair, even where the judge was "stern and short-tempered." Morales v. INS, 208 F.3d 323, 327 (1st Cir. 2000). Similarly, the IJ's attempts to expedite proceedings are "not the stuff of which a due process violation can be fashioned." Aguilar-Solis, 168 F.3d at 569. Indeed, Albathani's own counsel sought to expedite the hearing so that he could keep a scheduled court appearance that afternoon. The IJ's cross-examination of Albathani is expressly authorized by regulation. See 8 C.F.R. 208.9(c) ("The asylum officer shall have authority to . . . question the applicant and any witnesses."). Moreover, with regard to the scars, Albathani's counsel chose not to request more time to submit photographs.

Albathani had a full and fair hearing.

IV.

Petitioner, supported by amici, challenges the BIA's affirmance without opinion (AWO) procedure under which the IJ's decision was upheld. Petitioner claims that AWO violates due process; amici argue that it violates rules of administrative law.[6] Both say there must be a more substantive statement of the reasons for the BIA's decision.

---

[6] Although amici may not present legal theories not argued by the parties, see Lane v. First Nat'l Bank of Boston, 871 F.2d 166, 175 (1st Cir. 1989)(an amicus may not "interject into a case issues which the litigants, whatever their reasons might be, have chosen to ignore"), we view amici in this case as presenting variations on the arguments presented by Albathani.

The context of the claim is important. An alien has no constitutional right to any administrative appeal at all. Guentchev v. INS, 77 F.3d 1036, 1037 (7th Cir. 1996); see also Abney v. United States, 431 U.S. 651, 656 (1977)(no constitutional right to appeal in criminal cases). Nor has Congress given aliens any statutory right to an administrative appeal. Such administrative appeal rights as exist are created by regulations promulgated by the Attorney General. See 8 C.F.R. § 3.1(b)(2002).

The Attorney General first adopted the AWO procedure at issue in 1999. Rather than the usual three-member review, the "affirmance without opinion" procedure allowed for review of a case by a single member, who would affirm the IJ's decision with the statement: "The Board affirms, without opinion, the result of the decision below." 8 C.F.R. § 3.1(a)(7)(iii) (2002).[7] The AWO procedure was limited to certain categories of cases, designated by the Chairman of the BIA, see id. at (7)(i). Once the case was selected by the Chairman, one-member review was permissible where the Board member found that the case fit certain criteria:

> (ii) The single Board Member to whom a case is assigned may affirm the decision of the Service or the Immigration Judge, without opinion, if the Board Member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that

_____

[7] The September 25, 2002 amendment to the regulations restructured this section. See 67 Fed. Reg. 54,878 (Aug. 26, 2002) (to be codified at 8 C.F.R. § 3.1(e)(4)).

(A) the issue on appeal is squarely controlled by existing Board or federal court precedent and does not involve the application of precedent to a novel fact situation; or

(B) the factual and legal questions raised on appeal are so insubstantial that three-Member review is not warranted.

(iii) If the Board Member determines that the decision should be affirmed without opinion, the Board shall issue an order that reads as follows: "The Board affirms, without opinion, the result of the decision below. The decision below is, therefore, the final agency determination. See 8 CFR 3.1(a)(7)." An order affirming without opinion, issued under authority of this provision, shall not include further explanation or reasoning. Such an order approves the result reached in the decision below; it does not necessarily imply approval of all of the reasoning of that decision, but does signify the Board's conclusion that any errors in the decision of the Immigration Judge or the Service were harmless or nonmaterial.

Id. at (a)(7).[8] A further provision provided for the single member to return the case for full three-member consideration in the event that he or she determined that it was not suitable for one-member determination. Id. at (7)(iv).

---

[8] According to amici, the procedure was used sparingly until early 2002. In February 2002, the Attorney General proposed new rules that would, inter alia, increase the range of cases that could be reviewed under AWO procedure, and reduce the Board from 23 members to 11 members. The intent of the new rules was to eliminate the backlog of pending cases by reducing the amount of time allotted to each one. Since these new rules did not go into effect until September 2002, amici argue they had an immediate impact by causing Board members who wished to retain their jobs to hurry through as many AWO cases as possible. Albathani's case, amici argue, was heard under the 1999 regulations, but as part of a rush to meet new expectations. Nonetheless, this appeal only concerns the 1999 regulations under which his case was decided.

-24-

Promulgation of the AWO regulations is within the power of the INS.[9]  "[A]dministrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties."  Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 543 (1978).

Petitioner and amici present two theories in their challenge to the AWO procedure.  The first is that the BIA decision is the final decision and a BIA summary affirmance does not provide a reasoned basis for review.  The second is that a one-line summary affirmance provides no way for courts to police the BIA to see that it is actually doing its job according to the regulations it has promulgated.  Albathani and amici argue that the 1999 AWO procedure violates a basic principle of administrative law: the requirement that agencies provide reasoned bases for their decision.  As classically formulated in SEC v. Chenery Corp., 332 U.S. 194 (1946):

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set

---

[9] It is possible that the outcome of increased use of summary procedures will be to shift the backlog to the federal courts of appeal.  Indeed, the Ninth Circuit is already projecting a dramatic three-fold increase in the number of immigration appeals since 2001.  See L. Getter & J. Peterson, Speedier Rate of Deportation Rulings Assailed, L.A. Times, Jan. 5, 2003, at A1.  The highly-expedited nature of the review may prompt even more appeals to the courts.  Still, as amici point out, many non-citizens are unable to afford legal counsel and do not have pro bono counsel, and this may chill their willingness to go to court.

> forth with such clarity as to be understandable.  It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.

Id. at 196-97.  But both overlook the plain language of Chenery, which refers to agencies in their entirety, not individual components of agencies.  Here, the relevant agency -- the INS -- has presented a statement of reasons for its decision, albeit from the IJ rather than the BIA.  Chenery does not require that this statement come from the BIA rather than the IJ.

The BIA can adopt, without further explication, the IJ's opinion.  See Chen v. INS, 87 F.3d 5, 8 (1st Cir. 1996) ("[W]e join eight of our sister circuits in ruling that the Board need not write at length merely to repeat the IJ's findings of fact and his reasons for denying the requested relief, but, rather, having given individualized consideration to a particular case, may simply state that it affirms the IJ's decision for the reasons set forth in that decision.") (listing cases).

The contention here is that the AWO procedure is distinguishable from Chen because it permits affirmance without opinion even when the BIA disagrees with the IJ's reasoning.  The AWO regulation does indeed allow such an affirmance.  Because the summary affirmance is only of the "result" and not the reasoning, this means that courts of appeals are forced to review a decision which may or may not contain the reasoning of the BIA.  The court

-26-

thus reviews the BIA decision without knowing its basis. The summary affirmance scheme does create these problems, but they do not render the scheme a violation of due process or render judicial review impossible. Nor does the scheme violate any statute.

The courts will continue to have the IJ's decision and the record upon which it is based available for review. See also 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of Appeals shall decide the petition only on the administrative record on which the order of removal is based."). This permits a court to carry out an intelligent review.

In functional terms, if the BIA does not independently state a correct ground for affirmance in a case in which the reasoning proffered by the IJ is faulty, the BIA risks reversal on appeal. One of the several justifications for Chenery's requirement for explicit reasons derives from a limitation on the courts' ability to substitute different grounds. "[A] reviewing court . . . must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." Chenery, 332 U.S. at 196; see also Fed. Power Comm'n v. Texaco, Inc., 417 U.S. 380, 397 (1974) ("[A]n agency's order must be upheld, if at all, on the same basis articulated in

the order by the agency itself.").[10]  In short, if the BIA identifies an alternative satisfactory ground for upholding denial of asylum in a case with an otherwise unsatisfactory decision by the IJ, it must state it or risk remand.  Ordinarily, the case will be remanded to the agency, and the agency will not, in the end, have saved any time or effort.

The more serious argument is that the very nature of the one-line summary affirmance may mean that BIA members are not in fact engaged in the review required by regulation and courts will not be able to tell.  Immigration decisions, especially in asylum cases, may have life or death consequences, and so the costs of error are very high.  Amici point out that this fear is not abstract in light of the huge caseload faced by only 19 BIA members.  For example, the Board member who denied Albathani's appeal is recorded as having decided over 50 cases on October 31, 2002, a rate of one every ten minutes over the course of a nine-hour day.  See L. Getter & J. Peterson, Speedier Rate of Deportation Rulings Assailed, L.A. Times, Jan. 5, 2003, at A1.

In fact, it has taken us considerably longer than one day to review this case, and the record of the hearing itself could not be reviewed in ten minutes.  In general, even when the IJ decides the alien is not credible, there must be review of the record

---

[10]  Albathani argues that this very rule proves his point -- the court should know the true reasons for the BIA's action.  Our answer above applies to this as well.

before the IJ by the BIA.  The BIA itself has, on review of the record, rejected lack of credibility determinations by the IJ. Further, as we noted in Gailius, 147 F.3d at 47, there must be reasons for disbelief of uncontradicted testimony.  But our review here confirms that if there were any deviation from what the regulations required of the single BIA member (and there is no reason to think there is any), then the error would be harmless. There was a basis for affirmance and for summary affirmance.

Were there evidence of systemic violation by the BIA of its regulations, this would be a different case.  We would then have to face, inter alia, the INS's claim that the decision to streamline an immigration appeal is not reviewable by the courts because these are matters committed to agency discretion.  But see Abbott Labs. v. Gardner, 387 U.S. 136, 140 (1967) (presumption of reviewability of agency actions), abrogated in part by Califano v. Sanders, 430 U.S. 99, 105 (1977) (holding that the APA is not to be interpreted as an implied grant of subject-matter jurisdiction over agency decisions); Goncalves v. Reno, 144 F.3d 110, 127 (1st Cir. 1998), cert. denied, 526 U.S. 1004 (1999) (upholding judiciary's role in determining whether an agency's interpretation of a statute is permissible); cf. Saakian v. INS, 252 F.3d 21, 25-27 (1st Cir. 2001)(remanding case where BIA failed to apply its own rules).  We are not willing, however, in the absence of such evidence, to infer from these numbers alone that the required review is not taking

place.  Courts themselves use "summary affirmance" or "summary disposition" procedures in which parties may receive one-line dispositions of their appeals.  See, e.g., 1st Cir. R. 27.1.  These are workload management devices that acknowledge the reality of high caseloads.  They do not, either alone or in combination with caseload statistics, establish that the required review is not taking place.

For these reasons, the challenges to the AWO procedure are rejected.

V.

The decision of the BIA is **affirmed**.