# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 02-3861

DORIS C. OFORJI,

*Petitioner,*

*v.*

JOHN D. ASHCROFT, United States Attorney General,

*Respondent.*

_____

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A74 548 487

_____

ARGUED SEPTEMBER 23, 2003—DECIDED DECEMBER 31, 2003

_____


Before POSNER, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Doris C. Oforji appeals from an order of the Board of Immigration Appeals (BIA) affirming, without opinion, the decision of the Immigration Judge (IJ) denying her application for asylum and withholding of deportation. Oforji argues on appeal that the BIA erred by failing to appropriately weigh and consider the evidence presented; in failing to extend derivative asylum and relief to Oforji on behalf of her United States citizen children; and in issuing an affirmance without opinion. We affirm.

## I.

Oforji is a Nigerian citizen who sought entry into the United States at Chicago on April 4, 1996. The Immigration and Naturalization Service (INS) (now part of the Department of Homeland Security) denied Oforji entry, detained her, and charged her with being an alien seeking to procure entry by fraud or willful misrepresentation, as well as an alien not in possession of a valid immigration document.

Oforji's exclusion proceedings commenced on April 4, 1996. After delays, an initial hearing before an IJ was held on August 28, 1997, wherein Oforji admitted that she was an alien not in possession of a valid immigration document at the time of her entry, but denied the fraud and willful misrepresentation charges. She also requested asylum, withholding of deportation, and protection under the Convention Against Torture.

At the hearing, Oforji testified that she is a member of the Ogoni Tribe of Nigeria and that the Tribe lived without roads, schools, and potable water. She further stated that due to these poor living conditions, the Ogoni Tribe formed the "Movement for the Survival of the Ogoni People" to petition the Nigerian regime of General Sani Abacha for these services. She also claimed that the Abacha regime tortured and arrested, as well as killed members of the Movement, and that she participated in demonstrations against the Abacha administration. She testified that in 1995, the Abacha administration arrested her husband, "Chukwker," at their house for his participation in the Movement. She claims to have fled Nigeria to avoid arrest because she was too "outspoken." However, on cross-examination she admitted that she fled because "the back of the house was, was falling any way." In addition, at the hearing she acknowledged that Abacha has died since she fled, but stated in a conclusory fashion that the government

was nevertheless going to persecute her because of "oil." In addition, she claimed without corroboration that the Nigerian government would persecute her because she left the country without a visa and because she was a runaway Ogoni.

Finally, Oforji testified at the hearing that if she returned to Nigeria, her two daughters, citizens born in the United States, would undergo female circumcision or female genital mutilation (hereinafter collectively referred to as "FGM"). Oforji testified that she had undergone the procedure and that the Ogoni people required this of all women, with refusal punishable by death. She also testified that she did not have anyone with whom to leave her children in this country in the event she was deported to Nigeria. She admitted on cross-examination that she did not mention the fear that her then-unborn daughter would undergo FGM when asked by the immigration inspector about her political asylum claim.

After hearing this testimony, the IJ held that the evidence did not establish that she sought to procure entry by fraud or willful misrepresentation, but found that she was inadmissible on the separate ground of lacking a valid entry document. The IJ then denied Oforji's request for asylum relief primarily on the basis of an adverse credibility finding regarding her testimony, and due to the fact that she had already suffered FGM. Oforji filed a timely notice of appeal with the BIA.

Pursuant to statutory streamlining procedures of 8 C.F.R. § 3.1(a)(7)(ii)(A)-(B), the BIA issued a written decision on October 7, 2002, affirming without opinion the IJ's decision. Thus, the IJ's decision became the final agency determination for purposes of judicial review. Oforji filed a timely appeal to this court, arguing that the BIA incorrectly denied her claims and that the BIA's streamlined process was invalid.

## II.

### A. Application for Asylum and Withholding of Removal

Because the BIA adopted the IJ's decision, we review the IJ's analysis for substantial evidence. *Krouchevski v. Ashcroft*, 344 F.3d 670, 673 (7th Cir. 2003); *see generally Moin v. Ashcroft*, 335 F.3d 415, 418 (5th Cir. 2003) (explaining why the substantial evidence standard applies to cases in which the INS employs its streamlined procedure). Oforji, as the applicant for asylum, bears the burden of proof to establish asylum eligibility. *See* 8 C.F.R. § 208.13(a) (2002); *Dobrican v. INS*, 77 F.3d 164, 168 (7th Cir. 1996). We reverse in this context only if "no reasonable fact-finder could fail to find" that Oforji had suffered from past persecution or faced future persecution. *Georgis v. Ashcroft*, 328 F.3d 962, 967-68 (7th Cir. 2003) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)).

To be eligible for asylum, Oforji is required to establish "refugee" status, i.e., that she is an alien unwilling or unable to return home "because of . . . a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *Elias-Zacarias*, 502 U.S. at 481. She could show this by proving either that she (1) suffered past persecution on account of one of the enumerated categories, creating a rebuttable presumption of future persecution, or (2) has a well-founded fear of future persecution on account of one of the enumerated categories. *Yadegar-Sargis v. INS*, 297 F.3d 596, 601-02 (7th Cir. 2002); *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002).

Although "persecution" is not statutorily defined, we have said that it "means more than plain harassment and may arise from actions such as 'detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confisca-

tion of property, surveillance, beatings, or torture.' " *Tesfu v. Ashcroft*, 322 F.3d 477, 481 (7th Cir. 2003) (quoting *Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir. 1995)). Persecution can also include threats of "death, imprisonment, or the infliction of substantial harm or suffering." *Sharif v. United States*, 87 F.3d 932, 935 (7th Cir. 1996).

A well-founded fear of future persecution must be both subjectively genuine and objectively reasonable. *Mousa v. INS*, 223 F.3d 425, 430 (7th Cir. 2000). To establish the objective reasonableness of the fear, the alien must show, based upon credible, direct, and specific evidence, that a reasonable person in the same circumstances would fear persecution if returned to the petitioner's native country. *Bhatt v. Reno*, 172 F.3d 978, 982 (7th Cir. 1999).

We turn first to the IJ's adverse credibility findings which are entitled to "highly deferential review." *Mansour v. INS*, 230 F.3d 902, 905 (7th Cir. 2000); *Efe v. Ashcroft*, 293 F.3d 899, 903 (5th Cir. 2002) ("We give great deference to an immigration judge's decisions regarding an alien's credibility."). We require that an adverse credibility finding merely be supported by "specific, cogent reasons" that "bear a legitimate nexus to the finding." *Ahmad v. INS*, 163 F.3d 457, 461 (citations omitted). Adverse credibility findings are overturned only under "extraordinary circumstances." *Pop v. INS*, 270 F.3d 527, 531-32 (7th Cir. 2001).

Here, the IJ found multiple inconsistencies in Oforji's testimony and these "specific, cogent reasons" "bear a legitimate nexus" to the denial of her claim. As an initial matter, Oforji does not dispute the IJ's finding that she presented no evidence such as a membership card or letter from a party representative corroborating that she was in fact a member of the Movement for the Survival of the Ogoni People. *Cf. Abdulrahman v. Ashcroft*, 330 F.3d 587, 598-

99 (3d Cir. 2003) (upholding adverse credibility finding based in part on alien's failure to substantiate his generalized testimony by providing documentation of his membership or involvement in a politically active student union).

At the hearing, Oforji conceded that she told the immigration inspector on the date of her arrival that she was seeking political asylum solely for economic reasons and that she had not been persecuted in Nigeria. This is inconsistent with her testimony at the hearing that she fled because of her political activity and because the Abacha administration had arrested and killed her husband. To this date, Oforji has failed to explain why she told the immigration inspector that she had never been persecuted in Nigeria.

In addition, at the hearing, Oforji testified that she fled because the government had planned to arrest her because she was too "outspoken," but she offered no support for this statement. On cross-examination, consistent with her response to the immigration inspector at the time of her attempted entry to this country, she admitted that she fled the same night of her husband's arrest because the back of her house was falling away. Further, Oforji claimed that the Ogoni Tribe lived in "River State," and suffered from poor roads, schools, and water. However, Oforji acknowledged that her sister also lived in River State, but did not suffer from a lack of water, nor did she have problems with the Abacha administration. Similarly, Oforji also claimed that the Abacha government was persecuting her because of "oil" but failed to offer any facts supporting this conclusion, other than her assertion that she "knew it to be true." Importantly, despite claiming that she fled because of persecution from the Abacha administration, she conceded that Abacha was no longer in power in Nigeria due to his death.

Contrary to Oforji's contention, it was her responsibility to ensure that the inspecting immigration authorities had knowledge of her main reasons for seeking asylum in the U.S. *See, e.g., Roman v. INS*, 233 F.3d 1027, 1034 (7th Cir. 2000) (placing burden on asylum applicant to prove eligibility for asylum by proffering sufficient evidence to support her claim). Moreover, in an attempt to bolster the asylum claim, the addition of new factual assertions that were not originally set forth can be viewed as inconsistencies providing substantial evidence that the applicant is not a reliable and truthful witness. *See Malek v. INS*, 198 F.3d 1016, 1020-21 (7th Cir. 2000) (citing "a number of clear inconsistencies" between applicant's application and testimony). Oforji's claim that her statements were made under great stress and without the benefit of counsel not only implies an acknowledgment that her statements were not accurate, but also incorporates protections not required in immigration inspection questioning.

The above inconsistencies and gaps in Oforji's claim establish substantial reasons for the IJ to question her credibility and deny her claim for asylum and withholding of deportation.[1] *See Khano v. INS*, 999 F.2d 1203, 1208 (7th Cir. 1993).

---

[1] Oforji's request for asylum in this context is automatically considered to include a request for withholding of deportation. 8 C.F.R. § 208.3(b); *INS v. Stevic*, 467 U.S. 407, 420 n.13 (1984). As the standard of proof for withholding of deportation is higher than that needed to establish eligibility for asylum, the failure to sustain the burden of proof for asylum necessarily precludes eligibility for withholding of deportation. *See Bradvica v. INS*, 128 F.3d 1009, 1014 (7th Cir. 1997).

**B. Oforji's Claim for Derivative Asylum Under the Convention Against Torture**

We turn next to Oforji's argument that her United States citizen daughters are likely to suffer FGM in Nigeria if Oforji is deported. Oforji bases this claim of "derivative asylum" or "constructive deportation" (hereinafter used interchangeably) on the United Nations Convention Against Torture as made judicially enforceable through 8 C.F.R. §§ 208.16(c) and 208.18(b)(2). *See Castellano-Chacon v. INS*, 341 F.3d 533, 551 (6th Cir. 2003) (explaining briefly the process by which the non-self executing provisions of the Convention Against Torture became judicially enforceable).

The conditions under which an alien may be found eligible for the withholding of removal as a result of the probability of being subjected to torture in the country of removal are set forth in 8 C.F.R. § 208.16(c). The regulation states in relevant part that:

> In considering an application for withholding of re-moval under the Convention Against Torture, the immigration judge shall first determine whether *the alien* is more likely than not to be tortured in the country of removal. If the immigration judge determines that the alien is more likely than not to be tortured in the coun-try of removal, the alien is entitled to protection under the Convention Against Torture. Protection under the Convention Against Torture will be granted either in the form of withholding of removal or in the form of deferral of removal.

8 C.F.R. § 208.16(c)(4) (emphasis added).

We review the BIA's determination against withholding the removal of an alien for substantial evidence. *See, e.g., Ambati v. Reno*, 233 F.3d 1054, 1059 (7th Cir. 2000). The

language of the regulation unambiguously permits with-holding of removal due to torture personally suffered by the alien:

> The burden of proof is on the applicant for withholding of removal under this paragraph to establish that it is more likely than not that *he or she would be tortured* if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.

8 C.F.R. § 208.16 (2) (emphasis added)

Oforji has testified that she had already undergone FGM before entering this country, thus there is no chance that she would be personally tortured again by the procedure when sent back to Nigeria.[2] The regulation language is confined to the alien-applicant and seemingly forecloses a derivative claim. Nevertheless, Oforji requests this court to "extend derivative asylum" to her based on "new expansions and considerations" reflected in case law such as *Nwaokolo v. INS*, 314 F.3d 303 (7th Cir. 2002), and *In re Kasinga*, 21 I & N. Dec. 357 (BIA 1996). Oforji bases this request on her claim that "[t]his court has previously recognized that when an alien minor's parent is deported, the minor will have to accompany the parent into exile and is also effectively deported."

It is important to understand that claims of constructive deportation are cognizable only if such a claim falls squarely within the narrow holdings of the cases creating the doctrine. A brief review of these cases distinguishes Oforji's circumstances from the narrow ambit required for a claim of constructive deportation.

---

[2] It is undisputed that FGM as practiced in Nigeria constitutes "torture" within the meaning of the CAT. *See Nwaokolo v. INS*, 314 F.3d 303 (7th Cir. 2003).

*Salameda* involved a review of the now amended section 244(a)(1)[3] of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1), which permitted the BIA to suspend deportation in its discretion if the alien proved, *inter alia*, physical presence in the United States for at least seven years and that deportation would "result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." The Salamedas' child, Lancelot, was not a United States citizen, nor was he admitted to the United States for permanent residence. Accordingly, the IJ determined that the above statute precluded consideration of the hardship to Lancelot due to his parents' deportation. *Id.* However, the *Salameda* court concluded that since Lancelot was an alien with no legal right to remain in the United States, the deportation of his parents would result in him being "constructively deported" and that this hardship should have been considered by the INS. *Id.*

Significantly, unlike Oforji's children, the minor child in *Salameda* was not a United States citizen. Yet he was subject to deportation because his parents were being deported. The question raised was whether he was "entitled to ask for relief on his own account." *Id.* at 451. Since he was not the target of deportation, the order in that case "had the effect of depriving him of the right to request suspension of

---

[3] The present version of this section, amended effective April 1, 1997, authorizes cancellation of removal upon a showing of, *inter alia*, exceptional hardship and a minimum of ten years continuous physical presence in the United States. INA § 240A(b)(1), 8 U.S.C. § 1229a(b)(1) (2002). It is undisputed that Oforji does not meet the seven-year physical presence requirement, in place at the time her removal proceedings commenced, to qualify for suspension under this law. *See infra* at 12-13.

deportation." *Id.* The panel majority labeled the failure of the INS to include the minor in his parents' deportation hearing as an "ignoble ploy."

Oforji's claim does not fall within the narrow ambit of *Salameda.* Oforji's two female children potentially subject to FGM are both United States citizens, and thus, unlike the child in *Salameda,* have the legal right to remain in the United States. Moreover, *Salameda* involved **both** parents of the child being deported. Despite having the burden of proof regarding eligibility for withholding of removal under 8 C.F.R. § 208.16 (2), Oforji has failed to set forth any evidence regarding the existence or whereabouts of the father (or on the additional alternative of having a guardian appointed—a distasteful Solomonic choice) of her United States citizen children.[4] The children, as citizens, have an independent right to not be deported, but obviously they are dependent on their mother. So depending on the father's whereabouts, or the appointment of a guardian, they may have an opportunity to not follow their mother to Nigeria.

Turning to the remaining cases cited by Oforji, *Nwaokolo* is inapposite because it presented an alien's appeal from the denial of a petition to reopen removal proceedings. The appellant needed to show to this court "some" likelihood of success on the merits, part of a relatively low standard of review. *Nwaokolo,* involving an alien mother who had not been subjected to FGM, merely noted that "[i]t is *arguable,* therefore, that the BIA abused its discretion in denying Ms. Nwaokolo's motion to reopen if it failed to consider the threat that four-year-old Victoria will be subjected to

---

[4] We may not reverse based on evidence outside of the administrative record. *State of New York v. EPA,* 133 F.3d 987, 993 (7th Cir. 1998).

FGM as a direct consequence of the decision to remove her mother." *Id.* at 308 (citation omitted) (emphasis added).

Ms. Nwaokolo, also a native and citizen of Nigeria, legally entered the United States in the early 1980's. Because she accepted a job in violation of the terms of her visa, she was ordered deported but never left after being granted voluntary departure in 1986. She did not appeal, but beginning in 1996 filed several motions to reopen, seeking a stay of deportation. At that point she had three children, including a four-year-old girl who was a United States citizen. Also, she apparently had a continuous presence in the country for more than the prescribed seven-year time period. Given that status, under 8 U.S.C. § 1229b(b)(1)(D), she had an opportunity to have her removal cancelled and her status adjusted if she could establish that "removal would result in exceptional and extremely unusual hardship to [her] . . . child who is a citizen of the United States. . ." Because the BIA may have "failed to consider the threat that four-year-old Victoria [would] be subjected to FGM as a direct consequence of the decision to remove her mother," this court concluded that the BIA did not exercise its discretion by considering "all relevant factors" regarding the motion to reopen. *See id.*

Unlike Nwaokolo, Oforji did not first enter the United States legally, nor has she resided in the United States for the required continuous seven-year period. Thus she does not qualify for the "exceptional hardship" claim for her child under 8 U.S.C. § 1229b(b)(1)(D). Although the threatened hardship for her children is apparent, there is no statutory or regulatory authority for Oforji to have her own deportation suspended because she fears for her children if they return to Nigeria with her. Of course, as indicated above, as United States citizens they have the right to stay

here without her, but that would likely require some form of guardianship—not a Hobson's choice, but a choice no mother wants to make. Given the undesirable consequences of the choice she has to make, Oforji is in effect requesting that we amend the law to allow deportable aliens who have not resided here continuously for seven or ten years to attach derivatively to the right of their citizen children to remain in the United States. Any such amendment is for Congress, not the courts, to consider.

Finally, *Kasinga* is of no avail to Oforji because it involved an applicant who feared that she personally would be subjected to FGM if deported to her native country. *Kasinga* made specific findings that the alien applicant for asylum had a "well founded fear of persecution," a fear that is obviously not present in Oforji's case since she has already been subjected to FGM.

Oforji is correct that the IJ's opinion (adopted by the BIA) does not reflect consideration of the hardship that her deportation would cause in that it could potentially place her children at risk of FGM; however, Oforji cannot identify a legal basis for considering such hardships in the context of this case. As an excludable alien, it is undisputed that Oforji does not qualify for suspension of deportation. In addition, the continuous presence requirement[5] for suspension of deportation (which it is undisputed that Oforji does not meet) demonstrates that Congress considered the possibility of hardships to the family members of aliens not meeting the requirements for suspension of deportation, but limited the possibility of suspension to those who remained in the United States continuously for ten years. *See* 8 U.S.C. § 1229a(b)(1) (2002).

---

[5] *See* 8 U.S.C. § 1229b(b)(1)(D).

Undoubtedly, any separation of a child from its mother is a hardship. However, the question before us is whether this potential hardship to citizen children arising from the mother's deportation should allow an otherwise unqualified mother to append to the children's right to remain in the United States. The answer is no. Our prior cases have suggested that the threat of FGM to a United States citizen child resulting from the alien parents' deportation is a relevant factor to be considered in the context of a motion to reopen an alien's case; however, we now hold that an alien parent who has no legal standing to remain in the United States may not establish a derivative claim for asylum by pointing to potential hardship to the alien's United States citizen child in the event of the alien's deportation.

Assuming that the father of Oforji's children is out of the picture (which, as previously stated, cannot be assumed based on the record), Oforji will be faced with the unpleasant dilemma of permitting her citizen children to remain in this country under the supervision of the state of Illinois or an otherwise suitable guardian, or taking her children back to Nigeria to face the potential threat of FGM. Congress has foreseen such difficult choices, but has opted to leave the choice with the illegal immigrant, not the courts. The law is clear that citizen family members of illegal aliens have no cognizable interest in preventing an alien's exclusion and deportation. *See, e.g., Garcia v. Boldin*, 691 F.2d 1172, 1182-83 (5th Cir. 1982); *Burrafato v. United States Dept. of State*, 523 F.2d 554 (2d Cir. 1975), *cert. denied*, 424 U.S. 910 (1976); *Cervantes v. INS*, 510 F.2d 89, 91-92 (10th Cir. 1995); *Swartz v. Rogers*, 254 F.2d 338 (D.C. Cir.), *cert. denied*, 357 U.S. 938 (1958). Under the present law a woman who is otherwise a deportable alien does not have any incentive to bear a child (who automatically becomes a citizen) whose rights to stay are separate from the mother's obligation to depart.

### C. The BIA's Decision to Affirm Without Opinion the IJ's Decision

The final issue raised by Oforji presents two challenges to the BIA's issuance of a decision without an opinion. Her first argument is a facially-based challenge to the regulation permitting an affirmance without opinion, and her second argument challenges the Board's actual decision to affirm without an opinion in her particular case.

At issue is the streamlined procedure found at 8 C.F.R. § 3.1(e)(4) (Sept. 2002)[6], permitting a single Board Member to affirm, without opinion, the results of an IJ's decision when the Board Member determines: that the result was correct; that any errors were harmless or nonmaterial; and that the issue on appeal is not novel, but is squarely controlled by existing Board or federal case precedent or that the factual and legal issues are not substantial enough to warrant a written opinion.

This court has upheld the 1999 streamlining procedures as not depriving the court of a basis for judicial review nor as violating due process. *See Georgis v. Ashcroft*, 328 F.3d 962, 967 (7th Cir. 2003). Oforji fails to articulate any legally significant difference between the 1999 streamlining regulations and the current 2002 streamlining regulations under review and we therefore uphold the 2002 streamlining provisions.

The *Georgis* panel suggested that in some cases, the Board's decision to streamline and not publish an opinion

---

[6] The regulations are now found at 8 C.F.R. §§ 1003.1, 1003.2 (2003). Because the parties referred to the 2002 regulations and because the new regulations are either identical or substantially similar to the older versions, we continue to refer to the 2002 regulations.

may be subject to judicial review. *Id.* at n.4. Regardless, this appeal is not such a case since it merely involves Oforji's misapplication of established legal authority. The present opinion demonstrates that the court may simply conduct a full and fair review of the IJ's decision directly without the intervening step of a written BIA decision. Oforji's appeal is fact-dependent and, "[s]ince we review directly the decision of the IJ when a case comes to us from the BIA pursuant to [the streamlining provision], our ability to conduct a full and fair appraisal of the petitioner's case is not compromised, and the petitioner's due process rights are not violated." *Id.* at 967.

## III.

The decision to deny Oforji's claim for asylum and withholding of removal is supported by substantial evidence. Oforji's claim to derivative asylum under regulations implementing the Convention Against Torture is rejected for lack of legal support. We reject Oforji's facial challenge to the BIA's streamlining provisions, and we reject her challenge to the BIA's decision to streamline because that decision did not harm her in this case. For these and the foregoing reasons, we AFFIRM.

POSNER, *Circuit Judge*, concurring. I join Judge Manion's opinion in the main, though we interpret some of the facts in this confusing record differently. I write separately not

to quibble over these differences but to invite congressional attention to a pair of anomalies in the immigration laws.

Doris Oforji was turned down for asylum. One of her grounds for seeking it was that she has two young daughters (Nina, 6 years old, and Ingozi, 4) who if they go to Nigeria with her will be subject to a very high risk of undergoing when they reach puberty the procedure that has come to be called "female genital mutilation," although I prefer the older terms "female circumcision" and (in the alternative) "clitoridectomy and infibulation," because they are slightly less loaded and remind us that a related practice, male circumcision, is widespread in this country without being described as mutilation. I do not mean to suggest that I approve of female circumcision, but we should recognize that the cultures that do approve of it don't think that what they are doing is aptly described as "mutilation." But that is an aside; the risk of being forced to undergo the procedure is a recognized ground for asylum in this country. *Abankwah v. INS*, 185 F.3d 18, 20, 25-26 (2d Cir. 1999); *In re Kasinga*, 21 I. & N. Dec. 357 (BIA 1996). And in the case of a child, especially a small one, the parent will ordinarily be the child's proper representative and therefore authorized to file the asylum claim on the child's behalf. See *Gonzales v. Reno*, 212 F.3d 1338 (11th Cir. 2000); *Guidelines for Children's Asylum Claims* INS Policy and Procedural Memorandum from Jack Weiss, Acting Director, Office of International Affairs, to Asylum Officers, Immigration Officers, and Headquarters Coordinators (Asylum and Refugees), Dec. 10, 1998, 1998 WL 34032561 (INS).

But because Oforji's daughters were born in the United States, they are U.S. citizens, and since U.S. citizens can-

not be deported they are ineligible for asylum. And because Oforji does not argue that the children will be circumcised as a way of persecuting *her*, the risk of their being subjected to that procedure, great as that risk is conceded to be, does not strengthen her claim, and so they will be separated from their mother unless they return to Nigeria with her. Apparently the children have no relatives in the United States with whom they might live (they are also very young to be separated from their mother), for when asked at the immigration hearing, "Well, couldn't you leave your children here if you wanted to return?" she answered: "Who would I leave it for? Who is going to take care of it? Only I survive because when I was little my mother passed on so I know what I went through so how, how can—when in my life my children start going into the 15th year." This is obscure, but the implication is that the children have no relatives living in the United States, at least relatives capable of taking care of two young girls. We know that the father of the older girl is either dead or in Nigeria, where she was conceived. There is nothing in the record about the father of the younger girl. Probably, then, the only condition in which the girls could remain in the United States after their mother returned to Nigeria would be as foster children. That is the same unlovely status they would occupy were they aliens granted asylum while their mother was deported. So although they are citizens they are treated as badly as aliens.

Had their mother lived in the United States for at least seven years before deportation proceedings were instituted, however, she could plead hardship to the children as a basis for suspension of deportation. The period has been lengthened to ten years for deportation proceedings—now called "removal" proceedings—begun after

April 1, 1997, see *Romero-Torres v. Ashcroft*, 327 F.3d 887, 888-89 and nn. 3-4 (9th Cir. 2003); *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 597 (9th Cir. 2002), but it seems that deportation proceedings were begun against Oforji in 1996. However, she hadn't been here for seven years, so she can't obtain a suspension of deportation even under the earlier rule. And so the U.S. citizen children are to suffer severe hardship, either by being returned to Nigeria to face a procedure that we regard as torture or by being separated from their mother and consigned to a foster home, because the mother didn't have the wit to elude the Immigration Service for seven years.

The seven-year (now ten-year) rule has only a tenuous relation to the hardship of children whose parent is ordered deported. What is true is that the longer the children have lived in the United States, the greater the hardship to them of being sent back to their parent's native country—one of the unappetizing choices facing these children and a choice made more excruciating the longer they remain here and become acclimated to American ways. But the length of time a child has lived in the United States depends on when she was born as well as on when her parent came to the United States. The parent may have been here for ten years but the child have been born six months ago; or the parent may have been here for nine years but the child have been born eight years ago. The seven-year (or ten-year) rule is irrational viewed as a device for identifying those cases in which the hardship to an alien's children should weigh against forcing her to leave the country.

That is one rule that Congress should rethink and another is awarding citizenship to everyone born in the United States (with a few very minor exceptions, such as

the children of accredited foreign diplomats and of foreign heads of state on official visits to the U.S., *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898); *United States Citizenship*, United States Department of Justice Immigration & Naturalization Service Interpretation Letter, Interpretation 301.1(a)(4)(i), 2001 WL 1333852 (INS); 8 C.F.R. §§ 101.3(a)(1), 1101.3(a)(1)), including the children of illegal immigrants whose sole motive in immigrating was to confer U.S. citizenship on their as yet unborn children. This rule, though thought by some compelled by section 1 of the Fourteenth Amendment, which provides that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside," and in any event codified in 8 U.S.C. § 1401(a), which provides that "the following shall be nationals and citizens of the United States at birth: (a) a person born in the United States, and subject to the jurisdiction thereof," makes no sense. "The Federation for American Immigration Reform estimates that 165,000 babies are born each year in the United States to illegal immigrants and others who come here to give birth so their children will be American citizens." Kelley Bouchard, "An Open-Door Refugee Policy Has Its Critics," *Maine Sunday Telegram*, June 30, 2002, p. 11A. "Captured fighter Yaser Esam Hamdi is not a U.S. citizen, despite his Louisiana birth, argues the Friends of Immigration Law Enforcement. The group says the citizenship clause of the 14th Amendment doesn't mandate the practice of granting 'birthright citizenship' to children born on U.S. soil to temporary workers, illegal immigrants and tourists. . . . 'The situation we have today is absurd,' says the group's director. . . .' For example, there is a huge and growing industry in Asia that arranges tourist visas for pregnant women so they can fly to the

United States and give birth to an American. Obviously, this was not the intent of the 14th Amendment; it makes a mockery of citizenship.' " John McCaslin, "Inside the Beltway: Rotund Tourists," *Wash. Times*, Aug. 27, 2002, p. A7.

We should not be encouraging foreigners to come to the United States solely to enable them to confer U.S. citizenship on their future children. But the way to stop that abuse of hospitality is to remove the incentive by changing the rule on citizenship, rather than to subject U.S. citizens to the ugly choice to which the Immigration Service is (legally) subjecting these two girls. A constitutional amendment may be required to change the rule whereby birth in this country automatically confers U.S. citizenship, but I doubt it. Peter H. Schuck & Rogers M. Smith, *Citizenship Without Consent: Illegal Aliens in the American Polity* 116-17 (1985); Dan Stein & John Bauer, "Interpreting the 14th Amendment: Automatic Citizenship for Children of Illegal Immigrants," 7 *Stanford L. & Policy Rev.* 127, 130 (1996). The purpose of the rule was to grant citizenship to the recently freed slaves, and the exception for children of foreign diplomats and heads of state shows that Congress does not read the citizenship clause of the Fourteenth Amendment literally. Congress would not be flouting the Constitution if it amended the Immigration and Nationality Act to put an end to the nonsense. On May 5, 2003, H.R. 1567, a bill "To amend the Immigration and Nationality Act to deny citizenship at birth to children born in the United States of parents who are not citizens or permanent resident aliens," was referred to the House Subcommittee on Immigration, Border Security, and Claims. I hope it passes.

Our hands, however, are tied. We cannot amend the statutory provisions on citizenship and asylum.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*