**Ghassan Mustafa BEN HALIM,**
**Petitioner,**

v.

**John D. ASHCROFT, Attorney**
**General, Respondent.**

**Nos. 03–2148, 03–2149.**

United States Court of Appeals,
Seventh Circuit.

Argued June 15, 2004.

Decided July 8, 2004.

Christopher W. Helt, Helt & Associates, Chicago, IL, for Petitioner.

George P. Katsivalis, Department of Homeland Security, Office of the District Counsel, Chicago, IL, Victor M. Lawrence, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before POSNER, DIANE P. WOOD, and WILLIAMS, Circuit Judges.

## ORDER

Ghassan Mustafa Ben Halim, a native of Libya, sought asylum claiming past persecution based on political opinion. An immigration judge denied Ben Halim's application, concluding that he was barred from obtaining asylum because he had assisted the Libyan government in persecuting others, and, alternatively, that he failed to establish past persecution or a well-founded fear of future persecution. The Board of Immigration Appeals affirmed without opinion, and Ben Halim petitions for review of the agency's decision. In a separate petition Ben Halim also challenges the agency's decision to detain him pending his removal. We deny both petitions.

Ben Halim was born in Libya and lived there with his family until he was approximately 12 years old. His uncle was a

leader in an anti-government group, and another uncle had been a member of the Libyan government prior to the reign of Mu'ammar Qadhafi. When the Libyan government began cracking down on dissidents in the 1970s, many of Ben Halim's family members moved to neighboring Egypt. In Egypt, Ben Halim attended high school and then college, studying science, technology, and business administration. He attended college from 1991 to 1998. While Ben Halim was in college his parents moved back to Libya, but he remained in Egypt to finish his studies. Between 1998 and 2000 he continued to live in Egypt, although he was not attending school, did not work, and had no apparent source of income.

In 2000, Ben Halim entered the United States as a visitor for pleasure. He immediately sought asylum, although the precise basis of his asylum claim was unclear. In his lengthy, handwritten asylum application, Ben Halim alleged that he was afraid to return to Libya because of his uncles' anti-government activities. He also appeared to claim that the Libyan government had persecuted him by pressuring him to spy on other Libyans attending school in Egypt. He described how during college he was recruited to join the National Front For the Salvation of Libya ("NFSL"), a student anti-government group active in Egypt. He alleged that the Libyan government discovered his involvement in the NFSL and "pressured" him to use his position with the group to obtain information about Libyan nationals whom the government viewed as disloyal. He claimed that government operatives offered him large amounts of money and threatened that he would be denied his college degree and job opportunities if he did not cooperate. Operatives wanted detailed information about various students, including their activities, friends, and "ideas." He stated that because of his

activities with the NFSL he feared he would be detained, interrogated, or perhaps even tortured if he returned to Libya. He also suggested that he would be targeted by the Libyan government because he had been living in the United States.

The parties vigorously dispute whether Ben Halim is barred from obtaining asylum because he assisted the Libyan government in persecuting others. At the center of the dispute is Ben Halim's interview with an asylum officer shortly after he filed his asylum application. According to the asylum officer, during their meeting Ben Halim discussed at length how he assisted the Libyan government by giving regular reports on various students, several of whom were subsequently arrested, detained, and interrogated. Ben Halim stated that he planted wiretaps and bugs in students' homes at the behest of the Libyan government. He claimed that Libyan authorities asked him for information on students involved in anti-government activities and also students who had become deeply involved in Islam, because the government purportedly feared that religious persons might decide that Libyan human rights policies conflicted with the teachings of Islam. Based on Ben Halim's statements during the interview, the asylum officer concluded that he had assisted the Libyan government in persecuting others and was therefore statutorily ineligible for asylum. See 8 U.S.C. § 1101(a)(42) (rendering ineligible for asylum "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.").

At a hearing before an IJ, Ben Halim denied that he ever told the asylum officer that he had cooperated with Libyan authorities, asserting instead that he had refused to succumb to their pressure tactics.

When pressed by the government's attorney on cross-examination, Ben Halim admitted that he had promised to provide information on various students, but he claimed that he never actually provided any reports.

The asylum officer was then called to testify by the government, and she contradicted Ben Halim's account of their interview, offering 50 pages of notes she had taken during their meeting. She testified that she understood clearly from Ben Halim's statements that he had in fact given reports on various students over the course of several years. Her notes corroborated her account, and she pointed out that Ben Halim signed her notes in a dozen different places. She testified that she went over his statements with him in detail and that he willingly signed his name to reflect that he read and understood her account of their interview. Ben Halim admitted during his testimony that he had voluntarily signed the asylum officer's notes, but said that he could not read her handwriting and did not realize what she had written.

The government also relied on statements Ben Halim made in his asylum application to show that he had assisted Libyan authorities in persecuting others. Specifically, the government noted that Ben Halim wrote in his application that in 1997 he had signed papers agreeing to cooperate with Libyan authorities by giving them information on various students. At another point in his application, Ben Halim stated that operatives threatened to keep him from obtaining his college degree, in his own words, "forcing me to continue serving their needs." On cross-examination, the government asked Ben Halim why he used the word "continue" if he had not assisted Libyan authorities in the past. He responded that the asylum application, which had been prepared by his sister Susan, was poorly worded.

The IJ denied Ben Halim's asylum application, first finding that he was not credible. The IJ was troubled by the conflicts between Ben Halim's statements in his asylum application, his interview with the asylum officer, and his testimony at the hearing. The IJ observed that Ben Halim had signed and sworn to the accuracy of his asylum application, and he rejected Ben Halim's suggestion that the asylum application was inaccurate because of language difficulties. The IJ noted that the application had been prepared by Ben Halim's sister Susan, and Ben Halim's own witness—his brother-in-law—testified that Susan is proficient in English. The IJ also credited the asylum officer's account of the interview, disbelieving Ben Halim's testimony that he never told the officer that he had cooperated with Libyan authorities. Aside from the numerous discrepancies in his statements, the IJ also found significant that Ben Halim could not explain his activities in Egypt between 1998 and 2000; during this time he received no financial support from his family, had no job, did not attend school, and had no apparent source of income. The IJ concluded that Ben Halim had assisted the Libyan government in persecuting others by spying and providing reports on various students in exchange for money, and that he was therefore statutorily ineligible for asylum.

Alternatively, the IJ concluded that even if Ben Halim were not statutorily barred from obtaining asylum, he failed to establish facts showing that he had suffered past persecution. Ben Halim's testimony, if believed, was that he had been briefly detained by the Libyan government on four separate occasions. During these detentions he was not beaten or mistreated in any way, and each time he was released unharmed. The IJ concluded

that this treatment did not rise to the level of persecution and denied the application for asylum. The IJ also denied Ben Halim's requests for withholding of removal and voluntary departure. The BIA summarily affirmed the IJ's decision in a one-judge order.

In a subsequent motion, Ben Halim requested release on bond, arguing that he should not be detained pending his removal because he is not a flight risk and poses no danger to the community. The IJ denied his request, and the BIA affirmed.

Ben Halim filed two separate petitions for review, one from the order denying his asylum application, and the other from the bond order. This court consolidated the two petitions for briefing and disposition.

Because the BIA summarily affirmed the decision of the IJ, this court reviews the IJ's order. *See Oforji v. Ashcroft*, 354 F.3d 609, 612–13 (7th Cir.2003); *Georgis v. Ashcroft*, 328 F.3d 962, 967 (7th Cir.2003). We will uphold the agency's decision under the substantial evidence test so long as it is supported by reasonable, substantial, and probative evidence in the administrative record as a whole. *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *Olowo v. Ashcroft*, 368 F.3d 692, 699 (7th Cir.2004); *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir.2002).

The Attorney General has discretion to grant asylum to an alien who is a "refugee." A refugee is one who is unwilling or unable to return home "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *Krouchevski v. Ashcroft*, 344 F.3d 670, 671 (7th Cir.2003). The statute specifically excludes from the definition of "refugee" any person who "ordered, incited, assisted, or otherwise participated in the persecution of any person

on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(B); *Mousa v. INS*, 223 F.3d 425, 428 (7th Cir.2000). If there is evidence that an asylum applicant has assisted or participated in persecution, the burden shifts to the applicant to demonstrate by a preponderance of the evidence that he was not involved in such conduct. *See* 8 C.F.R. § 208.13; *Hernandez v. Reno*, 258 F.3d 806, 812 (8th Cir.2001).

■ Ben Halim's first argument is that the IJ erred in concluding that he failed to establish past persecution or a well-founded fear of future persecution. He argues that the IJ mischaracterized the facts and that he suffered "lengthy detentions" and also received a "death threat" while living in Egypt. The government counters that this court cannot reach Ben Halim's argument because he failed to raise it with the BIA.

To preserve the right to judicial review, an alien must raise and exhaust his administrative remedies as to each claim or ground for relief. *Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir.2004); *Mojsilovic v. INS*, 156 F.3d 743, 748–49 (7th Cir. 1998). In his brief before the BIA, Ben Halim raised two arguments: that the IJ erred in concluding that he was a persecutor; and that the IJ should have granted him withholding of removal under the Convention Against Torture. Ben Halim does not deny that he failed to raise his persecution argument to the BIA, instead suggesting that he was not required to present the argument below. He appears to argue that because the BIA did not issue its own opinion and we are reviewing the decision of the IJ, there would be no practical purpose in requiring him to raise his argument with the BIA. Ben Halim cites no authority for this proposition, nor is his

argument logical. The BIA affirmed in a one-judge order because it determined that Ben Halim raised no meritorious issues; had he properly raised the persecution argument, the BIA might have found it meritorious and issued an opinion correcting the IJ's error. Because Ben Halim did not raise his persecution argument below, he has waived it on appeal.[1] *See Tapia v. Ashcroft*, 351 F.3d 795, 797 n. 3 (7th Cir.2003); *Wedderburn v. INS*, 215 F.3d 795, 799 (7th Cir.2000).

The government argues that Ben Halim's failure to raise the persecution argument below renders all of his remaining arguments moot as well. The government is correct that Ben Halim's remaining arguments are moot in the sense that they lack any practical significance.[2] Ben Halim's chief remaining argument is that the IJ erred in concluding that he was a persecutor and thus statutorily barred from obtaining asylum. Even if we were to agree with Ben Halim that the IJ improperly found him to be a persecutor, he cannot (because of his failure to exhaust) challenge the IJ's alternative holding that he

failed to establish past persecution or a well-founded fear of future persecution. The agency's denial of asylum on that ground is conclusive, and there is no need for this court to decide whether Ben Halim is also statutorily ineligible for asylum because he was a persecutor. *See Mousa*, 223 F.3d at 429. For the sake of completeness, however, we touch briefly on Ben Halim's remaining arguments.

Ben Halim argues that the IJ erred in concluding that he assisted the Libyan government in persecuting others, but he wholly ignores the IJ's adverse credibility determination. In his brief Ben Halim relies heavily on his testimony before the IJ in which he "categorically denied any cooperation with the Libyan government." Notably absent is any discussion of the statements Ben Halim gave in his asylum application and during his interview with the asylum officer that conflicted with his testimony before the IJ. The IJ rejected Ben Halim's claim for asylum because he disbelieved Ben Halim's hearing testimony that he did not assist the Libyan government in persecuting others, instead credit-

---

1. Even if we were to reach this argument, Ben Halim's assertions that he suffered "lengthy detentions" and "death threats" are not borne out by the record. His testimony, if believed, was that he was detained in 1997 by Libyan officials for three days at the border because he did not have his passport; he was detained in 1998 for two days at the Libyan border and questioned about his lack of military service; and he was detained at the border on two occasions in 1999 and 2000 for two days each. Each time he was released unharmed. Regarding the "death threat," Ben Halim testified that while he was living in Egypt a Libyan student once came to his apartment wielding a gun and called him a "traitor." Ben Halim was not injured in this incident, nor is there any suggestion that the student who threatened him was connected to the government. *See Roman v. INS*, 233 F.3d 1027, 1034 (7th Cir.2000). The IJ reasonably concluded that these facts did not rise to the level of persecution. *See Sofinet v. INS*, 196

F.3d 742, 748 (7th Cir.1999) (brief detentions and mild harassment do not amount to persecution).

2. The government argues that because Ben Halim cannot challenge each of the agency's alternative findings, his petition for review is moot under Article III of the U.S. Constitution and must be dismissed, but the cases the government cites do not support this proposition. In *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336–37 (11th Cir.2001), the Eleventh Circuit held that the petitioner's challenge to a bond determination was rendered moot by the entry of a final order of deportation. *Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir.1995), does not pertain to mootness at all. In that case, the court declined to reach the petitioner's remaining arguments after deciding that one of the IJ's alternative conclusions, which barred the petitioner from obtaining relief, was supported by substantial evidence.

ing the asylum officer's account of their interview, in which Ben Halim described at length his activities on behalf of the Libyan government. Ben Halim has failed to provide any basis for this court to overturn the IJ's credibility determination.

Indeed, Ben Halim would have an uphill battle in convincing this court to overturn the IJ's credibility finding, because the IJ reasonably relied on the numerous conflicts between Ben Halim's asylum application, interview, and hearing testimony, all of which went to the heart of his claims. *See Capric,* 355 F.3d at 1089–90; *Oforji,* 354 F.3d at 613–14. And the explanations Ben Halim offered at the IJ hearing for these discrepancies were not very convincing—that he, a college-educated man, voluntarily signed the asylum officer's notes in a dozen different places without reading or understanding them; and that his asylum application was poorly worded due to language difficulties, even though he spoke English well enough to testify at the IJ's hearing without an interpreter, and his sister Susan, who prepared the asylum application, is proficient in English. Even if these explanations were convincing, Ben Halim must do more than simply offer a plausible excuse for the discrepancies; he must demonstrate that a reasonable factfinder would be compelled to credit his testimony. *See Elias–Zacarias,* 502 U.S. at 481; *Krouchevski,* 344 F.3d at 673; *Chen v. INS,* 344 F.3d 272, 275 (2d Cir. 2003). He has failed to do so.

Aside from ignoring the IJ's adverse credibility determination, Ben Halim also suggests that the IJ improperly held him responsible for his mere knowledge of the Libyan government's activities and not for his own conduct. In finding Ben Halim statutorily ineligible for asylum, the IJ observed that Ben Halim "was fully familiar with the activities of the Libyan government in harming individuals who were against the Libyan government." Ben Halim points to this statement and argues that knowledge alone cannot make him a persecutor, but he takes out of context one sentence in the IJ's analysis. The IJ simply made the point, as part of a larger discussion about Ben Halim's own conduct, that Ben Halim helped the Libyan government knowing what might happen to the students about whom he gave reports. We therefore reject Ben Halim's argument.

Ben Halim also argues that the BIA erred in deciding his case without issuing an opinion. His argument appears to be little more than a reiteration of his claim, discussed above, that the IJ erred in determining that he was a persecutor. To the extent Ben Halim may also be arguing that the BIA's streamlining procedures violate due process, we have repeatedly rejected such an argument. *See, e.g., Oforji,* 354 F.3d at 618–19; *Georgis,* 328 F.3d at 967.

■ Ben Halim's other arguments also lack merit. He challenges the IJ's denial of his request for voluntary departure, but we lack jurisdiction to review the agency's discretionary decision to deny voluntary departure. *See* 8 U.S.C. § 1229c(f); *Sofinet,* 196 F.3d at 748. He also challenges the IJ's denial of his request for release on bond pending his removal, but to the extent Ben Halim is entitled to any form of judicial review of the bond determination, it would be through a habeas corpus petition. *See Demore v. Kim,* 538 U.S. 510, 517, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003).

For these reasons, the petitions for review are DENIED.