**UNPUBLISHED ORDER**

Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 25, 2005
Decided November 29, 2005

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

| | |
|---|---|
| No. 03-2488 | On Petition for Review of an Order or Decision of the Board of Immigration Appeals |
| VALENTINA PONOMAREVA, *Petitioner*, | |
| *v.* | No. A78-654-291 |
| ALBERTO R. GONZALES, United States Attorney General, *Respondent*. | |

**O R D E R**

Valentina Ponomareva, a Ukrainian citizen, appeals the decision of the Board of Immigration Appeals (the "BIA") denying her application for asylum and withholding of removal. We deny the petition for review.

**I.**

Ponomareva is a native and citizen of the Ukraine who was, at one time, married to Alexander Tsyhanyuk. The couple gave birth to a son in 1976 before divorcing in 1982.

Ponomareva later had a daughter, though not with Tsyhanyuk. Ponomareva entered the United States in 1999 and applied for asylum a year after her arrival.

As this appeal involves discrepancies between Ponomareva's asylum application and her testimony before the immigration judge ("IJ"), we recount each in some detail. In her application for asylum, Ponomareva stated that, in 1994, her ex-husband was working for a joint venture among Israel, Portugal, Spain, and the Ukraine to develop an experimental jet plane to fight fires. During a June 1994 test run in Valencia, Spain, the plane crashed, killing Tsyhanyuk and four others. Ponomareva linked her request for asylum to her attempts to receive an insurance settlement from the Spanish government on behalf of her son, who was seventeen at the time of his father's death.

According to her application, Ponomareva pursued her son's claim for nearly five years. She stated that neither Spain nor Portugal would accept responsibility during most of 1995, but eventually the Ukrainian Ministry of External Affairs (the "Ministry") assured her that Spain would satisfy the claims of family members. After Ponomareva's son received no payment in 1996, she went to the Spanish embassy, which informed her that the Spanish government had not accepted responsibility but had made a payment to her ex-husband's widow for humanitarian reasons. The widow, however, told Ponomareva that she never received this payment.

Meanwhile, Ponamareva was not having any luck pressing her son's claims with the Ukrainian government. She also traveled to Spain where she was told that a settlement had been sent to the Ukraine. After Ponomareva returned to the Ukraine and demanded information from the Ministry about her son's claim, Ponomareva's son was arrested and physically mistreated. Eventually, he accompanied his mother to Spain for her further investigations, and then proceeded to Belgium.

Ponomareva's asylum application also details threats and mistreatment that she allegedly suffered. The day after returning from one of her visits to the Ministry, she was visited by four men claiming to be police who then destroyed her apartment. When she complained to the "militia," Ponomareva was informed that the people claiming to be police were hooligans. Later, she found a pair of her daughter's shoes at the entrance to her apartment, which she interpreted as a threat, prompting her to send her daughter to Israel. Ponomareva claims that she was beaten in January of 1999 and that police did not investigate her complaint. She asserts in the application that she received another beating at the hands of three men and a woman in August of 1999 and that, after meeting with police, the officers advised her to drop her complaint. Ponomareva then went to Israel for a week before traveling to the United States.

At Ponomareva's hearing before the IJ, changes abounded. Ponomareva told the IJ that her husband died in a plane crash while fighting a forest fire in Valencia. Further, she contended that high-level Ukrainian officials had commandeered monies intended for the victims' families.

Specifically, she pointed the finger at the Ukrainian Ministry of Foreign Affairs[1] and the Antonov Plant, a factory where her ex-husband once worked. While Ponomareva admitted that the victims' families (including her ex-husband's widow) received some compensation, she also testified that "all of the monies remained in the pocket of the people who worked for Minister of International Affairs and Antonov Plant."

As in her application, she claimed that her son was entitled to compensation but did not receive any. She expanded on her application, contending that she had discovered in Valencia that her son's name was allegedly on the list submitted by the Spanish government to an insurance company for compensation. She reported that after she informed authorities that she had a video showing Spain's responsibility for the accident, her son was beaten in order to stop him from obtaining an exit visa to Spain. Ponomareva eventually admitted that she came to the United States to file a lawsuit against the relevant countries and companies, though her son remained in the Ukraine and was attending school in economics.

Ponomareva explained to the IJ that she had suffered because of her investigations, but the details on this subject changed as well. Ponomareva testified that in 1999 she was hit on the head and knocked unconscious when she was returning to her apartment building. She informed the IJ that although the police had said that they would open a criminal case, she found, upon leaving the hospital, that they had not. Later, in the summer of 1999, Ponomareva was again hit in the head as she entered her apartment and was then beaten about the face and other parts of her body. She believed that there were several people involved in this assault and heard the word "writer," which she took as a reference to a possible article she claimed to be preparing about the accident and the corruption involved in the administration of the claims. She also stated that four people, including a female karate champion, made her withdraw a complaint she filed with the local militia about this attack.

After the IJ pressed her on the particulars of her asylum claim, including who would want to harm her, Ponomareva asserted that the Antonov Plant might hurt her if she returned to Ukraine. She concluded by suggesting that she would be in danger upon return to Ukraine because of the many important documents that she found in her investigation.

The IJ denied Ponomoreva's asylum application. He felt that the changes and additions to her story from the application to the hearing rendered Ponomareva's claim of past persecution not credible, and that she had shown no reasonable fear of future persecution, given that her son had

---

[1] While in her application Ponomareva repeatedly references the Ministry of External Affairs, the hearing transcript contains references to the Ministry of Foreign Affairs and the Minister of International Affairs. Despite the fluctuations in names, this appears to be the same ministry, the difference originating in translation.

been able to stay in Ukraine and attend university apparently without incident.  The BIA affirmed without an opinion, and Pomonareva appealed.  We affirm the IJ's decision.

## II.

Ponomareva raises two aspects of the IJ's determination.  First, she suggests that the IJ deprived her due process of law by frequently asking questions during the presentation of her asylum claim.  Second, she argues that there was insufficient evidence to support the IJ's credibility determinations, which led to his rejection of her claim.  As the BIA summarily affirmed, we review the IJ's decision as the final agency determination. *See Hussain v. Gonzales*, 424 F.3d 622, 626 (7th Cir. 2005).

## A.

Turning first to the IJ's actions, we conduct de novo review of a petitioner's challenge that an immigration hearing violated due process.  *See Kerciku v. INS*, 314 F.3d 913, 917 (7th Cir. 2003).  As in other contexts, due process requires a meaningful opportunity to be heard, and, if a hearing fails to satisfy this requirement, the petitioner must receive a new hearing. *See id.*; *see also Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004).  In deciding whether a petitioner has received a meaningful opportunity to present his case, we distinguish between those instances in which an immigration judge takes an active role to focus the proceedings on relevant issues and those instances in which an immigration judge bars a broad swath of testimony that supports the petitioner's claims.  *See, e.g.*, *Liu v. Ashcroft*, 380 F.3d 307, 315 (7th Cir. 2004); *Kerciku*, 314 F.3d at 917-18; *Podio v. INS*, 153 F.3d 506, 509-10 (7th Cir. 1998).

In this case, the IJ's actions comfortably rest on the permissible side of the line.  When her testimony seemed to wander, the IJ asked the attorney to "put this all into focus for me," and later, "lead me up to the basis for her claim." As the attorney could not help his client keep her testimony relevant, the IJ became more active in questioning. He focused Ponomareva's testimony on the pertinent issues, trying to understand how the pursuit of her son's claim justified asylum and of precisely whom she was afraid.  The IJ gave both Ponomareva and the attorney repeated opportunities to explain.  The IJ did not limit testimony that would support Ponomareva's claim, he simply asked those questions which he needed answered to understand whether asylum was appropriate. In fact, the IJ expressly stated "I'll allow you to cover anything you would like . . . [but] I found the testimony confusing and vague and the question is who is [it] that she's afraid of." This is a markedly different situation from those cases in which an IJ has violated a petitioner's due process rights by not allowing the petitioner to explain his claim.  *Cf. Podio*, 153 F.3d at 510 ("The frequency of the immigration judge's interruptions, and the impatience evident in many of his comments leave us unconvinced that the immigration judge 'was merely trying to point [petitioner] in what he thought was the right direction.'") The IJ did not offend Ponomareva's due process rights.

**B.**

Ponomareva also contends that the IJ's decision to deny asylum was incorrect because it was based on erroneous credibility determinations. To merit asylum, Ponomareva had to establish either that: (1) she suffered past persecution based on her race, religion, nationality, membership in a particular social group, or political opinion; or (2) she had a well-founded fear of future persecution. 8 U.S.C. §§ 1101(a)(42), 1158(b)(1). This court will only overturn an IJ's decision on asylum if the evidence compels a contrary result. *See Oforji v. Ashcroft*, 354 F.3d 609, 612-13 (7th Cir. 2003). To put it another way, we limit our review to determine whether substantial evidence supports an IJ's decision. *Kozal v. Gonzales*, 418 F.3d 798, 804 (7th Cir. 2005). An IJ's adverse credibility determination should be upheld if there are specific, cogent reasons that bear a legitimate nexus to the finding. *See Oforji*, 354 F.3d at 613.

Here, substantial evidence supported the IJ's decision denying asylum. The IJ recited specific reasons that Ponomareva was not credible, given that the story of the assaults changed significantly between her application and the hearing. While the application indicated that she was attacked by four people, then made to withdraw her police complaint by the police themselves, Ponomareva testified at the hearing that she was attacked by a couple of unknown assailants, then made to withdraw her complaint by a karate champion and three cronies. Given the introduction of a markedly different description of the assaults providing the basis for her past persecution claim, the IJ had a reason to conclude that Ponomareva was not credible.[2] *See Oforji*, 354 F.3d at 614 ("[T]he addition of new factual assertions that were not originally set forth can be viewed as inconsistencies providing substantial evidence that the applicant is not a reliable and truthful witness.").

The IJ also correctly determined that Ponomareva never connected any of the alleged assaults to her pursuit of her son's claim. Her only possible link was that she overheard the word "writer" during one of her beatings, which she took to refer to her investigations into the alleged corruption. Even assuming that this memory introduced first at the hearing was correct, Ponomareva's completely unsupported construction of what it meant simply cannot suffice to establish persecution based on a political opinion. Nor did Ponomareva show a possibility of future persecution. She relied on the fact that she had important documents that would expose corruption, but she failed to provide those documents. It should be noted that her son, on whose behalf the claim was filed and who helped with her investigation, still lives in Ukraine and attends university. Ponomareva showed neither past persecution nor a well-founded fear of future persecution, so the IJ was correct in denying her asylum.

---

[2] While the IJ based his credibility opinion on the inconsistencies in her stories about the assaults that might show past persecution, we note that there were many other inconsistencies in Ponomareva's story, including how her ex-husband died and under what circumstances her son was beaten.

## III.

For the reasons discussed above, therefore, the petition for review is denied.